# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

March 11, 2010

No. 08-31148

Charles R. Fulbruge III
Clerk

UNITED STATES OF AMERICA

Plaintiff - Appellee - Cross-Appellant

v.

ROBERT MCMILLAN; BARRY S SCHEUR

Defendants - Appellants - Cross-Appellees

Appeal from the United States District Court
for the Eastern District of Louisiana

Before REAVLEY, DAVIS, and STEWART, Circuit Judges.

REAVLEY, Circuit Judge:

Barry Scheur and Robert McMillan appeal their convictions for conspiracy and substantive mail and wire fraud offenses in connection with the failure of a health maintenance organization (HMO) known as The Oath for Louisiana, Inc. They challenge the timeliness and sufficiency of the superseding indictment, and they raise several claims of trial error. The Government cross-appeals the reasonableness of the sentences imposed. We conclude that the superseding indictment did not broaden the charges against the defendants and was both timely and sufficient. We reject the defendants' remaining claims and conclude that the district court did not abuse its discretion at sentencing. We therefore AFFIRM the district court's judgments in all respects.

No. 08-31148

## I.

This case concerns a scheme by defendants Barry Scheur and Robert McMillan to fraudulently represent the financial condition of The Oath for Louisiana, Inc., a Louisiana-licensed HMO. The Oath, as an HMO or plan, collected premiums and insured the medical expenses of its subscribers. The Government charged that the defendants devised a scheme to defraud and obtain money or property by filing false financial reports with the Louisiana Department of Insurance indicating that the HMO met minimum statutory net worth requirements in order to ensure the continued operation of the plan and the collection of premiums and management fees at a time when The Oath did not satisfy state requirements.

Scheur, a successful health care consultant from Massachusetts, acquired the HMO in January 2000 from a group of hospitals that had been running the plan as Southeastern Medical Alliance. Prior to the acquisition, Southeastern Medical Alliance had been losing money, and Scheur had been acting as its consultant to help improve its financial difficulties. Scheur agreed to take over ownership as part of an effort to turn around the HMO, and the prior owners made a capital contribution to the company of approximately $14 million as part of the transfer. After renaming the company, Scheur became its Owner, President, and Chief Executive Officer. A separate consulting firm controlled by Scheur, known as the Scheur Management Group, provided management services to The Oath and received fees of $200,000 to $350,000 per month. Scheur Management Group hired McMillan to help manage The Oath. He held various positions in the company, including Vice President, Chief Operating Officer, and Chief Financial Officer. Two other businesses controlled by Scheur acted as The Oath's parent company.

Louisiana law requires all HMOs in the state to file quarterly and annual financial reports containing information about assets and liabilities, as well as

accounts receivable and capital contributions. The state mandates that each plan maintain a minimum statutory net worth of $3 million as a cushion for claims. Financial reports are filed by mail and signed by company officials as true and correct. The state uses these reports, which are available to the public, to monitor the financial health of the plans operating in Louisiana and to ensure that HMOs can pay claims from medical services providers for care given to the plans' insureds. If an HMO suffers financial trouble, the Department of Insurance can take several remedial steps, such as placing the plan on administrative supervision, which is a period of intense financial monitoring; ordering a restructuring of the plan; or placing it into receivership and liquidating all assets to pay off its liabilities.

Despite Scheur's efforts as a "turnaround" specialist, The Oath continued to suffer financially and to incur increasing losses with each passing quarter. Because of these losses The Oath became in danger of falling below the $3 million capital surplus threshold. Beginning with the third quarter of 2000, the defendants caused to be filed false financial reports showing that the plan met or exceeded the minimum statutory amount by listing speculative or nonexistent receivables as assets. They also recorded as assets receivables "due from parent," which were supposed to be capital infusions from the parent company but which the parent company in reality did not have the ability to provide and which never materialized. The "due from parent" and other speculative assets did not meet the state criteria to be reported as assets and were invalid. These purported assets were included in quarterly financial statements for the third quarter of 2000 and the first and second quarters of 2001. Without these invalid assets reported on its financial statements, The Oath would not have met the minimum statutory net worth requirements.

As part of the scheme, Scheur also obtained a personal loan from a bank in New Orleans for $1.2 million in February 2001. This money was wire

transferred to the account of The Oath's parent company in Massachusetts before being transferred back to New Orleans and deposited into The Oath's account. The defendants reported the transaction in The Oath's 2000 annual financial report to the state insurance department as a capital infusion from the parent in order to raise The Oath's net worth above the $3 million threshold. In reality, there was never a real capital infusion because the defendants expected The Oath to pay Scheur back, which it did in April 2001.

Had the transfer of funds to The Oath been reported correctly there would have been no effect on The Oath's net worth because there would have been an increase in cash assets along with a corresponding increase in liabilities. Instead, it was reported as a straight cash infusion of equity. Then when Scheur's personal loan became due, the defendants withdrew the money from The Oath's account in New Orleans, wired it to a Scheur Management Group account in Massachusetts, and then transferred it back to the original lending bank in New Orleans, allowing Scheur to recoup his money and pay off the loan. They recorded the flow of money to Scheur Management Group on The Oath's internal books as a pre-payment of the management fees for April, May, and June of 2001 even though The Oath continued to pay its monthly management fees, thus double-paying the management company. To cover up this fact, in May 2001 the defendants reclassified the transaction from a pre-payment of fees to an account receivable in the form of a loan from The Oath to the parent company. To support the transaction they later created loan documents and corporate resolutions in September 2001, which were backdated to the original transaction date of April 2001.

Through such financial machinations, the defendants were able to keep The Oath operating free from regulatory interference and to continue collecting management fees from The Oath and insurance premiums from insureds even though the plan was not meeting the state requirements for net worth. The

state Department of Insurance became concerned about The Oath's financial condition, and it instructed the company to remove from its balance sheet suspicious payables from the parent company that were listed as assets.

In September 2001 the insurance department placed The Oath on administrative supervision. It also ordered that the monthly management fee paid to Scheur Management Group be reduced. In April 2002, however, with losses continuing to mount, the Department placed The Oath into receivership and began liquidation proceedings. At that time, The Oath's liabilities exceeded its assets by more than $40 million, much of which was owed to medical services providers. By that time, Scheur Management Group had been paid fees from The Oath of approximately $6.1 million.

The Government began the instant prosecution in November 2005 with an indictment charging the defendants with conspiracy and mail fraud, in violation of 18 U.S.C. §§ 371 and 1341. It later filed superseding indictments in 2006 that added additional counts of mail fraud and charges for wire fraud, in violation of 18 U.S.C. § 1343.

The defendants moved to dismiss the indictment on the ground that the only victim alleged therein was the state Department of Insurance, and the only "property" that could have been fraudulently obtained was a license to do business in Louisiana, which was not a cognizable mail fraud offense under the Supreme Court's decision in *Cleveland v. United States*.[1] After initially denying the motion, the district court reconsidered and granted it. The court held that the indictment had not set forth allegations that specific victims were defrauded of specific property.

On April 27, 2007, less than six months after the dismissal, the Government obtained a new indictment against the defendants, charging one

---

[1] 531 U.S. 12, 121 S. Ct. 365 (2000).

No. 08-31148

count of conspiracy to commit mail and wire fraud, five counts of substantive mail fraud, and eight counts of substantive wire fraud. The new indictment was substantially similar to the dismissed indictment but specified that the defendants had devised a scheme to defraud and obtain money and property "from The Oath, The Oath's insureds, and The Oath's medical services providers." It also specified that the defendants sought to enrich themselves through the continued operation of The Oath "by continuing to collect premiums from the insureds and continuing to collect management fees from The Oath."

The defendants again moved to dismiss the indictment, arguing that it was barred by the five year statute of limitations for federal criminal offenses. The defendants contended that the new indictment did not relate back to the original indictment because it impermissibly broadened the charges against them by adding new victims. The district court denied the motion.

Scheur was convicted at trial of conspiracy, three counts of mail fraud, and four counts of wire fraud. McMillan was convicted of conspiracy, one count of mail fraud, and one count of wire fraud.[2] The district court departed from the guidelines range for both defendants, sentencing Scheur to 20 months in prison and McMillan to 13 months. Both defendants timely appealed and have adopted the issues and arguments of each other's appellate brief.

## II.

The defendants raise three issues with respect to their indictment. We consider each in turn.

## A.

Scheur and McMillan both challenge the timeliness of the new indictment filed in 2007. "We review the district court's fact findings in relation to the

---

[2] A third defendant, Rodney Moyer, pleaded guilty to conspiracy prior to trial, and a fourth defendant, Danette Bruno, was acquitted by the jury. Neither is part of the instant appeal.

No. 08-31148

statute of limitations for clear error and its legal conclusions *de novo.*" *United States v. Gunera.*[3]

An indictment charging a defendant with a federal non-capital crime generally must be returned within five years after commission of the offense.[4] Once an indictment is filed, the limitations period is tolled on the charges set forth in the indictment. *United States v. Schmick.*[5] A superseding indictment that is filed while the original indictment is pending will relate back to the original indictment, and therefore also be timely, unless it broadens or substantially amends the charges.[6] However, a *new* indictment filed after an original indictment has been dismissed and the limitations period has passed is governed by 18 U.S.C. § 3288. That statute permits the Government to refile the indictment within six months after the original indictment is found to be defective.[7] But as with the filing of a superseding indictment, a new indictment

---

[3] 479 F.3d 373, 376 (5th Cir. 2007).

[4] 18 U.S.C. § 3282(a).

[5] 904 F.2d 936, 940 (5th Cir. 1990); *see also United States v. Sears, Roebuck & Co.*, 785 F.2d 777, 778–79 (9th Cir. 1986) (collecting cases).

[6] *Schmick*, 904 F.2d at 940; *see also United States v. Salmonese*, 352 F.3d 608, 622 (2d Cir. 2003).

[7] The statute provides, in relevant part:

Whenever an indictment or information charging a felony is dismissed for any reason after the period prescribed by the applicable statute of limitations has expired, a new indictment may be returned in the appropriate jurisdiction within six calendar months of the date of the dismissal of the indictment or information . . . .

18 U.S.C. § 3288.

filed under § 3288 may not broaden or substantially enlarge the charges of the original indictment. *United States v. Italiano*.[8]

The defendants reason that the 2007 indictment was filed more than five years after the end of their allegedly fraudulent conduct, which was in April 2002 when The Oath was placed on administrative supervision. Although this new indictment was filed less than six months after the original indictment was dismissed, the defendants argue that § 3288 cannot save it because the new indictment impermissibly broadened the charges by alleging for the first time new victims of the alleged scheme. The defendants contend that whereas the original indictment charged only that the Louisiana Department of Insurance had been defrauded by the mail and wire fraud scheme, the new indictment added as victims The Oath, The Oath's insureds, and The Oath's medical services providers. We are not persuaded.

The central policy underlying the limitations doctrine is notice to the defendants, which we consider to be the "touchstone" when deciding if a new indictment has substantially changed the original charges.[9] "If the allegations and charges are substantially the same in the old and new indictments, the assumption is that the defendant has been placed on notice of the charges against him."[10] We are concerned with whether the defendant "knows that he will be called to account for certain activities and should prepare a defense."[11] We agree with the district court that the original indictment gave the defendants

---

[8] 894 F.2d 1280, 1283 (11th Cir. 1990) ("In sum, an untimely indictment can only be saved by the section 3288 exception if it does not broaden or substantially amend the original charges 'tolled' by the previous indictment.").

[9] *Schmick*, 904 F.2d at 940.

[10] *Id.*

[11] *Id.*

sufficient notice of the acts for which they would be accountable, and the 2007 indictment did not impermissibly broaden those charges.

The original indictment in this case charged that from September 2000 through April 2002 the defendants

> did knowingly and willfully devise and intend to devise a scheme and artifice to defraud and obtain money and property by means of material and false and fraudulent pretenses, representations, and promises by misleading the LDOI [Louisiana Department of Insurance] into believing that The Oath was meeting the statutorily required minimum net worth of $3 million, and thereby unlawfully enriching themselves through the continued operation of The Oath, during a time when The Oath was not meeting that statutorily required minimum net worth.

The indictment described The Oath's business and alleged that the plan "received insurance premiums from and on behalf of member individuals and groups (known as insureds) and, in turn, paid medical providers such as hospitals and physicians for services provided to the insureds." It also explained the regulatory oversight of the state insurance department and the measures that department could take with respect to HMOs failing to meet the regulatory requirements. The indictment charged that at the time The Oath was placed on administrative supervision, The Oath had paid Scheur's management company approximately $6.1 million in management fees. It also alleged that at the time The Oath was placed into receivership, the plan's liabilities exceeded its assets by approximately $45 million. It went on to describe the various mailings of allegedly false financial reports that misstated The Oath's net worth and allowed it to keep operating without intervention from the state insurance department.

In the new indictment filed in 2007, the Government charged that the defendants

> did knowingly and willfully devise and intend to devise a scheme and artifice to defraud and obtain money and property, *specifically from The Oath, The Oath's insureds, and The Oath's medical service*

No. 08-31148

*providers*, by means of material and false and fraudulent pretenses, representations, and promises by misleading the LDOI into believing that The Oath was meeting the statutorily required minimum net worth of $3 million, and thereby unlawfully enriching themselves through the continued operation of The Oath, *specifically by continuing to collect premiums from the insureds and continuing to collect management fees from The Oath*, during a time when The Oath was not meeting that statutorily required minimum net worth.

Aside from the emphasized language above, the 2007 indictment was virtually identical to the original indictment.

As notice is the touchstone, "the crucial inquiry is whether approximately the same facts were used as the basis of both indictments."[12] We think that is the case here, and like the district court, we find the Eleventh Circuit's decision in *Italiano* persuasive. In that case, the original indictment alleged that the defendant's participation in a bribery scheme violated the mail fraud statute through a deprivation of honest government services.[13] After the Supreme Court repudiated that theory of mail fraud in *McNally v. United States*,[14] the defendant's conviction was reversed on the ground that the indictment had been fatally flawed.[15] The Government then obtained a new mail fraud indictment alleging the same basic facts as the first indictment but changing the object of the fraud from deprivation of honest services to deprivation of property, namely a cable television franchise.[16] The Eleventh Circuit held that the new indictment was timely under § 3288 and did not broaden the charges even though the first

---

[12] *Italiano*, 894 F.21d at 1285.

[13] *Italiano*, 894 F.2d at 1281.

[14] 483 U.S. 350, 107 S. Ct. 2875 (1987).

[15] *Italiano*, 894 F.2d at 1281–82.

[16] *Id.*

indictment had nowhere stated that the object of the scheme was to defraud the government of a cable television franchise.[17] The court reasoned that the facts and "sequence of actions" allegedly performed by the defendant as part of the scheme were the same in both indictments and provided the defendant with notice of the conduct for which he would have to provide a defense.[18]

The same is true in the instant case. Both the original indictment and the new indictment alleged that The Oath received premiums and management fees at a time when the plan was operating in violation of state regulatory requirements; both indictments alleged the same sequence of events by the defendants to misrepresent The Oath's financial condition despite its failure to meet those requirements; and both indictments alleged the same mailings and wire transfers in furtherance of the alleged scheme.

The original indictment alleged that the defendants devised a scheme to obtain money and property and enriched themselves by the continued operation of The Oath; that they collected insurance premiums from insureds; and that they were paid large sums in management fees.

The new indictment specifically alleged that The Oath, The Oath's insureds, and the medical services providers were the source of the defrauded money and property. But we fail to see how this materially altered the charge of the original indictment when the original indictment nowhere alleged that the *state insurance department* was the source of that money or property. The new indictment merely specified that the company, the insureds, and the medical providers lost money or property and that the defendants enriched themselves

---

[17] *Id.* at 1285.

[18] *Id.*; *see also United States v. Gengo*, 808 F.2d 1, 3–4 (2d Cir. 1986) (holding that defendant had sufficient notice of acts for which he would be held accountable and that superseding indictment did not broaden charges where first indictment alleged a conspiracy to evade federal income taxes and the later addition of a conspiratorial act to defraud the IRS related only to that evasion scheme).

No. 08-31148

by continuing to collect premiums and management fees. This specificity fleshed out the mechanism by which the defendants carried out the scheme.[19] The new indictment neither added statutory charges against the defendants nor exposed them to increased punishment.[20] It also did not change the facts as to the defendants' underlying conduct that constituted the alleged violations of the statutes.[21] As the district court held, the new indictment provided more explicit detail to the allegation that the defendants presented false information to the state insurance department in order to collect premiums, which they used to pay themselves management fees rather than paying medical services providers for services rendered at a time when The Oath was incurring increasing losses on a quarterly basis. We think this allegation was also inescapable from the original indictment.[22] Because we conclude that the defendants were placed on notice by the original indictment of the actions for which they would be held to account and which were then charged in the new indictment, there was no broadening of the charges and the district court correctly denied the motion to dismiss the new indictment as untimely.

---

[19] *See United States v. O'Bryant*, 998 F.2d 21, 25 (1st Cir. 1993) ("When a superseding indictment does no more than specify the exact mechanics of a defendant's participation in a previously charged offense, it does not represent a material broadening or substantial amendment of the original indictment.").

[20] *See Schmick*, 904 F.2d at 941.

[21] *See Italiano*, 894 F.2d at 1285 (stating that "the first indictment provided sufficient notice of the actions which allegedly constituted criminal conduct and of the type of evidence that the government would introduce at trial"); *id.* at 1285 n.7 (rejecting as insignificant the fact that the second indictment identified the recipient of the cable television franchise and also identified an unindicted co-schemer).

[22] *See Salmonese*, 352 F.3d at 623 (holding that there was no broadening of charges where defendant was informed by the original indictment "'in no uncertain terms that he would have to account for essentially the same conduct with which he was ultimately charged'" in the new indictment) (citation omitted).

12

No. 08-31148

## B.

Defendants also challenge the sufficiency of the indictment to state a valid mail and wire fraud offense. We review the sufficiency of an indictment *de novo*. *United States v. Crow*.[23]

The mail fraud statute prohibits the use of the mail for "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises[.]"[24] "To sufficiently charge the offense of mail fraud, the indictment must allege that (1) the defendant devised or intended to devise a scheme to defraud, (2) the mails were used for the purpose of executing, or attempting to execute, the scheme, and (3) the falsehoods employed in the scheme were material." *United States v. Ratcliff*.[25] The first element may be met by a variety of schemes,[26] but the relevant form of the scheme in this case is the deprivation of money or property.

Defendants contend that the indictment failed to state a mail fraud offense because although it alleged that The Oath, the insureds, and the medical services providers were victims of the scheme, it alleged misrepresentations made only to the state Department of Insurance, which was not deprived of any money or property. They contend that the alleged scheme to deceive the insurance department in order to obtain money from the third-party victims is contrary to Supreme Court and Fifth Circuit precedent, which they contend

---

[23] 164 F.3d 229, 234 (5th Cir. 1999).

[24] 18 U.S.C. § 1341. The wire fraud statute prohibits similar schemes perpetrated "by means of wire, radio, or television communication in interstate or foreign commerce[.]" 18 U.S.C. § 1343. The same analysis applies to convictions for both mail and wire fraud offenses. *See United States v. Humphrey*, 104 F.3d 65, 70 n.3 (5th Cir. 1997).

[25] 488 F.3d 639, 643–44 (5th Cir. 2007) (footnotes omitted) (citing *United States v. Caldwell*, 302 F.3d 399, 409 (5th Cir. 2002)).

[26] For example, 18 U.S.C. § 1346 permits a defendant's scheme to include the deprivation "of the intangible right of honest services."

13

No. 08-31148

requires that the scheme be to defraud the actual victim and that the object of the scheme be money or property in the hands of that deceived victim. Defendants rely for support of their argument on the Supreme Court's decision in *Cleveland* and our decision in *Ratcliff*.

In *Cleveland*, the Supreme Court held insufficient under the mail fraud statute an allegation that defendants made misrepresentations to state authorities when applying for a license to operate video poker machines because permits or licenses are not "property" under the mail fraud statute.[27] The Court concluded that it is not enough that the object of the fraud (the license) might become property in the recipient's hands; rather, "for purposes of the mail fraud statute, the thing obtained must be property in the hands of the victim."[28]

In *Ratcliff*, a Louisiana parish president was charged with an election scheme to defraud the parish out of salary and other benefits by concealing campaign finance violations from the state Board of Ethics, thereby deceiving the voting public about contributions, securing his reelection to office, and causing the parish to pay his salary.[29] We held that the indictment failed to state a valid mail fraud offense because there were no allegations that the parish was deceived into taking action or deprived of money it would not otherwise have afforded to the winner of the election.[30] We noted that the alleged scheme was to defraud the state Board of Ethics and the voters rather than the victim alleged in the indictment, which was the parish. We concluded that the

---

[27] *Cleveland*, 531 U.S. at 15, 121 S. Ct. at 368.

[28] *Id.*

[29] *Ratcliff*, 488 F.3d at 645.

[30] *Id.*

No. 08-31148

"indictment provides no basis to find a scheme to defraud Livingston Parish through misrepresentations made to the Board of Ethics."[31]

The defendants argue that their indictment is invalid because misrepresentations made to the state Department of Insurance, like the misrepresentations made to the Board of Ethics in *Ratcliff*, did not implicate any property rights in the hands of the alleged victims of the scheme—The Oath, the insureds, and the medical services providers. We disagree. Although the defendants are correct that the object of a mail fraud scheme must be money or property in the hands of the victims, we think they read too much into *Cleveland* and *Ratcliff*.

In *Cleveland*, the Supreme Court was concerned with whether an intangible property right represented by a license for video poker could be the object of a mail fraud offense, and it held that it could not because the property at issue in an alleged scheme must actually be money or property at the time of the offense rather than a mere regulatory interest.[32] We have no similar intangible property right at issue here.

In *Ratcliff*, we were concerned with whether salary and benefits that would have been paid regardless of the defendant's misrepresentations could still be money or property under the mail fraud statute, and we held that it could not.[33] The defendants focus on *Ratcliff*'s discussion that the parish in that case

---

[31] *Id.*

[32] *See Cleveland*, 531 U.S. at 20, 121 S. Ct. at 371 ("The question presented is whether, for purposes of the federal mail fraud statute, a government regulator parts with 'property' when it issues a license. For the reasons we now set out, we hold that § 1341 does not reach fraud in obtaining a state or municipal license . . . . [W]hatever interests Louisiana might be said to have in its video poker licenses, the State's core concern is *regulatory*.") (emphasis in original).

[33] *See Ratcliff*, 488 F.3d at 645 ("Although the charged scheme involves Ratcliff ultimately receiving money from the parish, it cannot be said that the parish would be deprived of this money by means of Ratcliff's misrepresentations, as the financial benefits

15

No. 08-31148

was not deceived.    But as we explicitly recognized in *Ratcliff*, "the misrepresentations in a mail fraud scheme need not be made directly to the scheme's victim."[34]  The import of *Ratcliff* was that the alleged victim was not defrauded of any money or property.[35]  Although *Ratcliff* found that the parish was not deceived, it did so as part of the analysis of whether the parish lost money or property that it would have otherwise retained.  We do not read *Ratcliff* as requiring that the victim who loses money or property in a mail fraud scheme also be the party that was deceived by the defendant's scheme.  This is contrary to the panel's recognition that misrepresentations need not be made directly to the victim, and it is contrary to sister circuit precedent.  *See United States v. Christopher*[36] ("Nothing in the mail and wire fraud statutes requires that the party deprived of money or property be the same party who is actually deceived."); *United States v. Blumeyer*[37] ("[A] defendant who makes false representations to a regulatory agency in order to forestall regulatory action that threatens to impede the defendant's scheme to obtain money or property from others is guilty" of mail fraud.); *United States v. Kennedy*[38] (holding that the plain language of the mail fraud statute "requires only the devising of a *scheme* for obtaining money or property by means of false or fraudulent pretenses, representations, or promises—not the making of misrepresentations to any particular individuals") (emphasis in original); *but see United States v. Lew*

budgeted for the parish president go to the winning candidate regardless of who that person is.").

[34] *Id.* (citing *United States v. Pepper*, 51 F.3d 469, 473 (5th Cir. 1995)).

[35] *Id.* at 645–46 ("The misrepresentations simply do not implicate the parish's property rights.").

[36] 142 F.3d 46, 54 (1st Cir. 1998).

[37] 114 F.3d 758, 768 (8th Cir. 1997).

[38] 64 F.3d 1465, 1476 (10th Cir. 1995).

(holding that there must be "an intent to obtain money or property from the victim of the deceit").[39]

It is irrelevant for our purposes whether alleged misrepresentations about The Oath's financial condition were made to the state Department of Insurance or directly to the alleged victims of the scheme.[40] The issue is whether the victims' property rights were affected by the misrepresentations. We think they were.

The scheme alleged here was for the defendants to obtain money from The Oath and the insureds in the form of management fees and premiums, respectively, which was possible only because of The Oath's continued operation as a result of the fraudulent statements, and then to retain the money rather than pay it out to satisfy claims of the medical providers. We think this satisfies *Cleveland*'s requirement that the object of the fraud be actual money or property in the hands of the victim. It also satisfies *Ratcliff*'s requirement that the scheme be to defraud the victim insofar as victims were left without money that they otherwise would have possessed. But for the defendants' scheme to keep The Oath operating and to keep collecting premiums and fees, the medical services providers would not have been left with unpaid claims.[41] Other courts have recognized that the deception of regulatory agencies for the purpose of

---

[39] 875 F.2d 219, 222 (9th Cir. 1989).

[40] We also note that The Oath's financial statements filed with the state were public documents available for review by the alleged victims. They were therefore at least indirect representations; e.g., the evidence showed that medical services providers reviewed and relied on those statements.

[41] *Cf. Christopher v. Miles*, 342 F.3d 378, 384 (5th Cir. 2003) ("The fraudulent acquisition of regulatory approvals was merely incidental to the broader purpose of the scheme—defrauding the insurance companies and their policyholders out of millions of dollars.").

allowing victimization of third parties is a cognizable mail fraud offense.[42] That is what happened here, as the defendants kept The Oath operating in violation of statutory requirements, only to have the HMO end up in liquidation with unpaid claims of more than $40 million.

The defendants similarly argue that even if the indictment is facially valid, the evidence at trial was insufficient to support a mail fraud conviction because the only misrepresentations proved in the case were made to the state Department of Insurance and there was no evidence that they obtained any money or property from any of the victims. But for reasons similar to our rejection of the defendants' challenge to the sufficiency of the indictment, we reject their sufficiency-of-the-evidence argument. The Government was not required to prove that misrepresentations were made directly to any of the victims.[43] It was also not required to prove that any victim actually suffered a loss, *see United States v. Loney*,[44] although we think the evidence did show losses by medical services providers that inured to the defendants. For example, Ken Keller, an executive with Tenet Health Systems, testified that Tenet lost millions of dollars when The Oath failed. Although Keller did not testify that money flowed directly from Tenet to The Oath, a rational jury could conclude that Tenet lost money because The Oath failed to pay Tenet for outstanding claims that were due.

---

[42] *See Blumeyer*, 114 F.3d at 767–68; *United States v. Cosentino*, 869 F.2d 301, 307 (7th Cir. 1989) ("[I]n misleading the Department of Insurance, the scheme permitted the agency to remain in business past the point it would have had the Department been aware of the defendants' activities—and that additional time allowed the defendants more time to take [the victim's] money . . . .").

[43] *See Ratcliff*, 488 F.3d at 645; *Pepper*, 51 F.3d at 473; *see also Kreuter v. United States*, 218 F.2d 532, 535 (5th Cir. 1955) ("[I]t is not necessary to prove communication of the alleged false representations to the victims.").

[44] 959 F.2d 1332, 1337 (5th Cir. 1992) (holding that Government need not prove victim of fraud was actually harmed by showing a financial loss).

No. 08-31148

The Government was required to prove only a scheme to defraud, the use of the mail or wire communications, and a specific intent to defraud.[45] The defendants' sufficiency-of-the-evidence argument focuses only on the target of the alleged misrepresentation, an argument which we conclude is unavailing. We therefore find the evidence was sufficient.

## C.

Finally, the Defendants argue that the district court improperly allowed a constructive amendment of the indictment by permitting testimony that went beyond the indictment's allegations, and by refusing the defendants' request for a curative jury instruction. We review this claim *de novo*. *United States v. Alhalabi*.[46]

"[A]fter an indictment has been returned, its charges may not be broadened through amendment except by the grand jury itself." *United States v. Hoover*.[47] "A constructive amendment violates the defendant's right under the Fifth Amendment to a grand jury indictment." *United States v. Rubio*.[48] A constructive amendment "occurs when it permits the defendant to be convicted upon a factual basis that effectively modifies an essential element of the offense charged or permits the government to convict the defendant on a materially different theory or set of facts than that with which she was charged."[49]

Ken Keller, the regional director of managed care for Tenet Health Systems, one of The Oath's medical services providers, testified that he had general discussions with Scheur about The Oath's finances and the need for

---

[45] *Id.*

[46] 443 F.3d 605, 614 (7th Cir. 2006).

[47] 467 F.3d 496, 500 (5th Cir. 2006) (internal quotation marks and citation omitted).

[48] 321 F.3d 517, 521 (5th Cir. 2003).

[49] *Hoover*,  467 F.3d at 500–01 (internal quotation marks and citation omitted).

timely payment of claims. He said that Scheur told him The Oath's finances were in good shape. He also testified that he investigated The Oath's financial condition by researching and relying on the company's filings with the state Department of Insurance, and he explained the importance of getting accurate financial information about HMOs in order to make business decisions. Defendants objected to Keller's testimony because although the indictment alleged misrepresentations were made to the state Department of Insurance, it did not allege direct misrepresentations to medical services providers such as Keller. Defendants asked that the jury be instructed that it could not convict them unless it found that the state Department of Insurance had been defrauded. Defendants argue on appeal that the Government charged them with committing their offense in a specific manner and that without the requested jury instruction, the indictment was impermissibly broadened to allow the jury to convict them based on allegations that were not in the indictment. We disagree because we do not think this is a case where the indictment charged commission of an offense in one specific manner but the district court permitted a conviction based on another, entirely different manner. *See, e.g., Stirone v. United States*.[50]

The indictment here specifically charged that the defendants devised "a scheme or artifice to defraud and obtain money and property, specifically from . . . The Oath's medical services providers . . . ." We agree with the district court that Keller's testimony was probative of the defendants' scheme. Keller testified

---

[50] 361 U.S. 212, 219, 80 S. Ct. 270, 274 (1960) (invalidating defendant's Hobbs Act conviction where indictment charged interference with interstate commerce of sand but trial court permitted conviction based on interference with interstate commerce of steel); *see also Hoover*, 467 F.3d at 502 (reversing conviction for making false statement where indictment charged defendant lied to federal agent by stating only one person told him about a "double flooring" problem when more than one person had actually done so, but trial judge instructed that defendant could be found guilty merely if he knew his statement was false rather than if more than one person told defendant about the problem).

No. 08-31148

that his company lost money and that he had relied on The Oath's statements to the insurance department. The district court instructed the jury that the defendants were charged with defrauding the victims by misleading the state Department of Insurance and that the Government had to prove the crime was committed in the specific manner as alleged in the indictment. There was no mention of direct representations to medical services providers, and we conclude that the instructions did not permit a conviction based on a theory or set of facts materially different from that charged in the indictment.[51]

## III.

Next, the defendants raise multiple claims of trial error. We conclude, however, that none of the defendants' claims rises to the level of reversible error.

## A.

The defendants contend that during the Government's rebuttal argument to the jury the prosecutor improperly commented on their election not to testify. They point to two specific comments. First, the prosecutor stated during rebuttal that "Not one of these defendants is stepping up and saying that they did anything wrong." Defense counsel immediately objected and moved for a mistrial. Counsel noted that the prosecutor had also gestured toward the defendants. The district court denied the motion but gave a curative instruction, stating that "no defendant need testify, they need put on no evidence, they need not put on anything at all." The court further stated that it "is always the government's burden to prove every essential element and the defendant need to prove nothing." The court instructed the jury to disregard the prosecutor's comment.

Then when rebuttal argument resumed, the prosecutor explained that he had misspoke and meant to refer to defense *counsel*, not the defendants:

---

[51] *See Hoover*, 467 F.3d at 500–01.

No. 08-31148

What I meant to say was here is that there is blame being played [sic] at the face of everybody in this courtroom but there's no responsibility at all being taken on behalf of the defendants. Okay. That's what was meant to be said here. The defense counsel, not the defendants, the defense counsel stepped up to this podium and blamed everybody in this courtroom. But not once did they explain to you, did they take responsibility for the actual items, the schemes in this case.

Defense counsel renewed the motion for a mistrial, which was denied.

"Prosecutors are prohibited from commenting directly or indirectly on a defendant's failure to testify in a criminal case." *United States v. Johnston*.[52] A remark will be found impermissible "if the prosecutor's manifest intent was to comment on the defendant's silence or if the character of the remark was such that the jury would naturally and necessarily construe it as a comment on the defendant's silence."[53]

We have "set a high threshold for reversible error" based on alleged improper comments. *United States v. Sylvester*.[54] "Reversal is not warranted unless the improper comment had a clear effect on the jury." *United States v. Montoya-Ortiz*.[55]

We do not find reversal warranted here even if we assume that the prosecutor's comments improperly reflected on the defendants' failure to testify.[56] In context, we think the comments were more an isolated remark than

---

[52] 127 F.3d 380, 396 (5th Cir. 1997).

[53] *Id.*

[54] 143 F.3d 923, 929 (5th Cir. 1998) (addressing comment by witness about the defendant's failure to testify).

[55] 7 F.3d 1171, 1179 (5th Cir. 1993) (internal quotation marks and citation omitted).

[56] *See Johnson*, 127 F.3d at 398 (subjecting improper comments to harmless error analysis and considering the prejudicial effect of comments, the efficacy of curative instructions, and strength of evidence of guilt).

No. 08-31148

a call for the jury to focus on the fact that the defendants did not testify. *See United States v. Griffith.*[57] Furthermore, the district court gave an immediate curative instruction that the Government bore the burden of proof and that the defendants need not testify or prove anything. Under similar circumstances, we have previously held that such an instruction cures any alleged harm from the prosecutor's improper remarks. *See United States v. Lampton.*[58] The district court also specifically instructed the jury both at the close of the Government's case and in its full jury charge that the defendants had a constitutional right not to testify and that the jury may draw no inferences from a defendant's election not to testify. That the jury heeded these instructions and was not inflamed by the prosecutor's comments is supported by the verdicts finding Scheur and McMillan guilty on some charges but not guilty on others, and by its full acquittal of another defendant. *See United States v. Saenz.*[59] We therefore do not see an error causing a clear effect on the jury and conclude that the prosecutor's comments failed to rise above the level of harmless error.

## B.

Scheur, who has been blind since birth, next raises a due process challenge to the district court's failure to provide him with reasonable accommodations because it did not require the Government to produce its exhibits in Braille form and it later denied him a continuance to review voluminous new exhibits

---

[57] 118 F.3d 318, 325 (5th Cir. 1997) (holding remark "was an isolated comment, which did not 'strike at the jugular' of the defense, and which the jury was immediately instructed to disregard").

[58] 158 F.3d 251, 260 (5th Cir. 1998).

[59] 747 F.2d 930, 942–43 (5th Cir. 1984) ("That the jury was not inflamed is demonstrated by the fact that one defendant was acquitted on all charges and three other defendants acquitted on at least one charge. This indicates to us that the jury carefully weighed the evidence against each defendant, acquitting when the evidence was insufficient.").

No. 08-31148

produced on the eve of trial.  We review this claim *de novo. United States v. Williams.*[60]

There were over 150 exhibits in this case of some 900 pages that included quarterly reports, financial statements, accounting and bank records, and various pieces of correspondence displayed to the jury during testimony.  Scheur argues that the failure to provide him with reasonable accommodations, such as Braille translations of the exhibits, prevented him from following the testimony and assisting his counsel in analyzing the documents or confronting witnesses.  He compares the district court's error to the denial of an interpreter for a defendant who cannot speak English or the denial of a sign translator for a deaf defendant.

We agree with Scheur that reasonable accommodations ought to be made to ensure that a defendant facing trial can comprehend the proceedings against him.  *Cf. Drope v. Missouri.*[61]  When faced with a defendant who is affected by blindness or deafness, the court "should afford such a defendant reasonable facilities for confronting and cross-examining the witnesses as the circumstances will permit." *People ex rel. Myers v. Briggs.*[62]  Determining what is reasonable is done based on the totality of the circumstances and involves a "basic balancing of [the defendant's] rights under the Sixth Amendment against the public's

---

[60] 343 F.3d 423, 439 (5th Cir. 2003).

[61] 420 U.S. 162, 171, 95 S. Ct. 896, 903 (1975) (stating that test for mental competency requires that defendant have capacity to understand nature and object of proceedings against him, to consult with counsel, and to assist in his defense).  Scheur does not challenge on appeal the district court's finding that he was competent to stand trial, and instead raises the more narrow argument that the denial of reasonable accommodations denied him the ability to comprehend the exhibits, follow the testimony, and assist in his defense.

[62] 263 N.E.2d 109, 113 (Ill. 1970).

24

interest in the administration of criminal law." *Ferrell v. Estelle*.[63]  The Constitution does not require "a perfect trial" or that defendants understand the proceedings with the "precision of a Rhodes Scholar;" rather, "[t]he Constitution requires that a defendant sufficiently understand the proceedings against him to be able to assist in his own defense."[64]  While we are sympathetic to Scheur's physical impairment, we conclude that Scheur was not subject to a fundamentally unfair trial.

It may be true that Scheur could not see the Government's exhibits displayed to the jury during testimony, but the exhibits were not a complete surprise to him.  As the district court noted, Scheur and defense counsel had access to most of the Government exhibits at least three weeks prior to trial, which was the deadline for disclosure in the district court' scheduling order.  In addition, this prosecution had been ongoing for nearly three years, yet Scheur did not raise an issue about his inability to comprehend exhibits until the eve of trial.  Moreover, many of the exhibits came from The Oath's own files or were the subject of civil litigation that resulted from The Oath's failure and that had been ongoing for several years.  We agree with the district court that as the company's President and Chief Executive Officer, Scheur either was presumed to have knowledge of those exhibits or ignored their contents at his peril.

We are also mindful that Scheur is a sophisticated and well-educated businessman and lawyer.[65]  He has worked as in-house counsel for health care organizations, consulted for state insurance regulators, and operated multiple businesses during his long career, and he has had to contend with complex

---

[63] 568 F.2d 1128, 1132 (5th Cir.), *opinion withdrawn on other grounds*, 573 F.2d 867 (5th Cir. 1978).

[64] *Id.* at 1131–32.

[65] The record shows that Scheur graduated magna cum laude from Tufts University and later graduated from Yale Law School.

documents throughout his professional life. He testified during a pre-trial hearing to consider his need for accommodations that in the past he has relied heavily on other people to synthesize and present information to him in summary fashion. While he could not see the exhibits as they were displayed to the jury, he could hear the testimony about them and assist his counsel during the trial. While listening to the testimony is perhaps not as effective as actually seeing the exhibits, this situation is unlike a deaf or a non-English speaking defendant who would have no understanding whatsoever of the proceedings against him without an interpreter. Furthermore, Scheur challenges the Government's exhibits in their entirety but fails to address in his brief the district court's finding that many of the exhibits came from The Oath. Our review of the record confirms this finding. The failure to provide Braille translations of exhibits that came from Scheur's own company or to which he had sufficient access did not render the trial fundamentally unfair.

Scheur also complains, however, that just six days before trial the Government produced approximately 3,000 pages of new exhibits, including witness statements and grand jury testimony, to which he did not previously have access. He contends that it was physically impossible for him to review these documents before trial and that the district court erroneously denied his request for a continuance so that they could be translated into Braille. Again, we are sympathetic to Scheur but find no reversible error. We think any defendant, with or without a physical impairment, could have had difficulty reviewing the voluminous new exhibits, but Scheur does not contend that the Government produced the material impermissibly late. In fact, the Government asserted at oral argument that it produced the new exhibits, which included *Jenck*s Act material, in accord with the local rules. As the Government pointed out, everyone knew that this material would be forthcoming, yet Scheur never asked that it be produced earlier or that it be translated into Braille before trial.

No. 08-31148

Moreover, Scheur points out no exhibit or statement that caused a disadvantage to his defense because the Government did not produce it sooner. Finally, at least some, though not all, of the new material also came from The Oath's own files. We are left then with the district court's denial of a request for a continuance on the eve of trial, but we conclude that Scheur has not demonstrated the requisite abuse of discretion or prejudice. *See United States v. Scott.*[66]

In sum, the right to due process "'is, in essence, the right to a fair opportunity to defend against the State's accusations.'"[67] We conclude that Scheur had a fair opportunity to defend his case, and we note that the case was very well-tried on both sides. The due process challenge is unavailing.[68]

## C.

The defendants next argue that the district court violated its role as gatekeeper for expert evidence by allowing three fact witnesses—Alan Parker, John Black, and Roland Sheehan—to give opinions based on Louisiana's statutory accounting rules when the witnesses were not qualified as experts in Louisiana law. They contend that the testimony should have been excluded as

[66] 48 F.3d 1389, 1393 (5th Cir. 1995) ("This court will reverse a district court's decision denying a defendant's motion for continuance only when the district court has abused its discretion and the defendant can establish that he suffered serious prejudice.") (internal quotations and citation omitted).

[67] *Ferrell*, 568 F.2d at 1131 (quoting *Chambers v. Mississippi*, 410 U.S. 284, 294, 93 S. Ct. 1038, 1045 (1973)).

[68] Amici argue that the Government violated Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794(a), by failing to produce its exhibits in Braille form because regulations governing the Department of Justice require the Department to "furnish appropriate auxiliary aids where necessary to afford a handicapped person an equal opportunity to participate in, and enjoy the benefits of, a program or activity conducted by the agency." 28 C.F.R. § 39.160(a)(1). We need not decide whether a criminal prosecution is included within the kind of program or activity intended to be covered by this anti-discrimination regulation because this issue was never presented in the district court and is not properly before us. *See Stephens v. Zant*, 716 F.2d 276, 277 (5th Cir. 1983). Furthermore, as we concluded above, we find that Scheur had an adequate opportunity to participate in his own defense.

No. 08-31148

improper expert testimony.  We find no abuse of discretion by the district court. *See United States v. Watkins.*[69]

If a witness is called upon to provide an expert opinion because the witness's specialized knowledge may assist the jury's understanding of the issues, the district court is required by its gatekeeping role to ensure that the expert is properly qualified and that the testimony is reliable.[70]  A witness who provides only lay testimony may give limited opinions that are based on the witness's perception and that are helpful in understanding the testimony or in determining a fact in issue, but the witness may not opine based on scientific, technical, or other specialized knowledge.[71]

Although Parker, Black, and Sheehan were not experts in Louisiana law, the defendants complain that the district court failed to conduct a proper *Daubert* analysis before permitting the witnesses to opine about the application of Louisiana accounting rules to The Oath, such as whether The Oath should have reported certain cash infusions and receivables as assets affecting net equity.  They assert that these witnesses gave improper testimony based on the law of other states rather than Louisiana.  We disagree that the witnesses gave improper expert testimony.

---

[69] 591 F.3d 780, 786 (5th Cir. 2009) ("When an objection is properly made, we review a district court's evidentiary rulings for an abuse of discretion."); *see also United States v. Hicks*, 389 F.3d 514, 524 (5th Cir. 2004) ("This court reviews a district court's decision to admit expert testimony under an abuse-of-discretion standard.").

[70] FED. R. EVID. 702; *see Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592–93, 113 S. Ct. 2786, 2796 (1993) (requiring district court to consider expert testimony by assessing "whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue"); *see also United States v. Cooks*, 589 F.3d 173, 179–80 (5th Cir. 2009) (explaining district court's gatekeeper role).

[71] *See Cooks*, 589 F.3d at 179–80; FED. R. EVID. 701.

No. 08-31148

Alan Parker, a certified public accountant, worked at an HMO in Alabama that Scheur subsequently purchased. Scheur asked Parker to examine The Oath's second quarter 2000 accounting reports prior to submission to the state Department of Insurance, and Scheur later hired him to work at The Oath as interim CFO. Parker also was privy to The Oath's compilation of its third quarter accounting reports. Parker testified about The Oath's booking of assets on those reports, the effect on net equity, and what he told Scheur about his opinions of The Oath's reporting. Although Parker defined certain accounting terms during the course of his testimony, he provided factual information about the circumstances of the case and his interaction with Scheur.

John Black, a former insurance regulator in Florida, was also hired by Scheur, specifically to investigate possible recoveries of claims from Medicare that The Oath could book as receivable assets. His testimony generally concerned this investigation and the conclusions he reached about possible receivables. Both Black and Parker properly testified as fact witnesses about their observations and perceptions in the case in response to specific solicitations from Scheur. *See, e.g., United States v. Rigas.*[72]

Roland Sheehan was an auditor hired by the state Department of Insurance to conduct a targeted review of The Oath's financial statements, specifically its assets. He testified about his actions in reviewing The Oath's assets and his finding that certain claimed receivables on the statements did not qualify as admitted assets. This factual testimony about Sheehan's investigation

---

[72] 490 F.3d 208, 224 (2d Cir. 2007) ("A witness's specialized knowledge, or the fact that he was chosen to carry out an investigation because of this knowledge, does not render his testimony 'expert' as long as it was based on his 'investigation and reflected his investigatory findings and conclusions, and was not rooted exclusively in his expertise. . . .'") (citation omitted); *see also United States v. Miranda*, 248 F.3d 434, 441 (5th Cir. 2001) (holding that witness with "extensive participation" in an investigation could testify about opinions and personal perceptions formed therefrom).

was also not impermissible expert testimony.[73] To the extent that some of the witnesses' testimony may have implicated specialized knowledge by defining certain accounting terms and discussing standardized accounting guidelines, we conclude that the error in allowing the testimony, if any, was harmless because in the context of the entire trial we see no reasonable basis to find an effect on the jury's verdict. *See United States v. Yanez Sosa.*[74] We therefore find no reversible error in the district court's evidentiary rulings.[75] Because we find no error, we also reject the defendant's assertion that the district court failed to give a curative instruction to the jury about the witnesses' testimony.

Having considered the defendants' claims of trial error, we find no basis for reversal of the convictions.[76] The district court's judgments are therefore affirmed. We turn next to the Government's cross-appeal.

## IV.

The Government argues in its cross-appeal that both Scheur's and McMillan's sentences are unreasonable. More specifically, it contends that the district court erroneously calculated the defendants' Sentencing Guidelines ranges based on an incorrect determination of the loss caused by the offense and

---

[73] *See Rigas*, 490 F.3d at 224.

[74] 513 F.3d 194, 201 (5th Cir. 2008) (holding that improper admission of expert testimony is subject to harmless error analysis).

[75] The defendants assert in a one-sentence footnote that the district court improperly admitted expert testimony from four other witnesses. We decline to review this argument as conclusory and inadequately briefed. *See United States v. Charles*, 469 F.3d 402, 408 (5th Cir. 2006) ("A single conclusory sentence in a footnote is insufficient to raise an issue for review."). We also refuse to consider the defendants' argument that the testimony of Parker, Black, and Sheehan should have been excluded under Federal Rules of Evidence 401 and 403 because this argument is also inadequately briefed. *See United States v. Lindell*, 881 F.2d 1313, 1325 (5th Cir. 1989); FED. R. APP. P. 28(a)(9).

[76] The defendants also assert a claim of cumulative error, but because we find no merit in the individual claims we reject the cumulative error claim. *See United States v. Stephens*, 571 F.3d 401, 412 (5th Cir. 2009).

that the district court erroneously failed to order the payment of restitution.

We ordinarily engage in a bifurcated analysis of a sentence imposed by the district court. *United States v. Delgado-Martinez.*[77] We first examine whether the district court committed any procedural errors, including its calculation of the Guidelines range, before considering the substantive reasonableness of the sentence. *See Gall v. United States.*[78] The Government challenges only the district court's calculation of the Guidelines ranges and makes no argument about substantive reasonableness.

We review a district court's interpretation or application of the Sentencing Guidelines *de novo* and its factual findings for clear error. *United States v. Cisneros-Gutierrez.*[79] "Factual determinations regarding loss amount for guideline calculation purposes are reviewed for clear error." *United States v. Ollison.*[80] "A factual finding is not clearly erroneous as long as it is plausible in light of the record read as a whole." *United States v. Krenning.*[81] "The court need only make a reasonable estimate of the loss . . . based on available information."[82]

When calculating the defendants' Guidelines ranges, the district court rejected the Government's argument that it should apply a 22-level sentence enhancement under U.S.S.G. § 2B1.1(b)(1)(L) based on a loss amount of over $40 million, which was the amount by which The Oath's liabilities exceeded its

---

[77] 564 F.3d 750, 752 (5th Cir. 2009).

[78] 552 U.S. 38, 51, 128 S. Ct. 586, 597 (2007).

[79] 517 F.3d 751, 764 (5th Cir. 2008).

[80] 555 F.3d 152, 164 (5th Cir. 2009).

[81] 93 F.3d 1257, 1269 (5th Cir. 1996).

[82] U.S.S.G. § 2B1.1 cmt. n.2(C) (2001).

No. 08-31148

assets when it was placed in liquidation.[83]  The court reasoned that The Oath was a financially troubled company at the time Scheur acquired it and that it would have suffered losses even if it had ceased operations immediately rather than be sold to Scheur.  Although the court believed the defendants' fraud allowed the company to keep operating and caused additional losses, it concluded that the amount of loss actually caused by the defendants' conduct could not reasonably be calculated.[84]  Instead, the court determined that the defendants' gain from the offense, represented by their respective salaries, should be used as an alternative measure when calculating the offense levels.[85]  The court accepted as reasonable the defendants' estimate that Scheur made approximately $199,000 in salary from his work at The Oath during the period following the fraudulent corporate filings, while McMillan made approximately $130,000.  The court therefore applied a 10-level sentence enhancement and determined that Scheur's Guidelines range was 97 to 121 months and that McMillan's Guidelines range was 78 to 97 months.[86]  The district court departed downward from the Guidelines ranges and sentenced Scheur to 20 months and McMillan to 13 months.

The Government does not challenge the district court's departure from these ranges, and it argues only that the court should have applied the 22-level

---

[83] *See* U.S.S.G. § 2B1.1(b)(1)(L) (2001) (providing for a 22-level enhancement for a loss that is more than $20 million but not more than $50 million).  The 2001 version of the Sentencing Guidelines was applicable in this case.

[84] *See United States v. Olis*, 429 F.3d 540, 545–46 (5th Cir. 2005) (holding that a defendant convicted of an economic crime is "responsible at sentencing only to the extent that losses are caused directly by the offense conduct").

[85] *See* U.S.S.G. § 2B1.1 cmt. n.2(B) (2001) (providing that the gain resulting from an offense should be used as an alternative measure of loss if there is a loss but it reasonably cannot be determined).

[86] *See* § 2B1.1(b)(1)(F) (providing for a 10-level enhancement when the offense results in a loss of more than $120,000 but not more than $200,000).

enhancement. It reasons that The Oath was solvent when Scheur took over but was worth negative $41 million when it was liquidated, which it argues is the actual loss caused by the offense. The Government contends that had the defendants provided truthful information in the financial statements the Department of Insurance could have taken prompt corrective action sooner, and no losses would have been suffered because all outstanding claims owed to medical services providers could have been paid.

The district court conducted a loss determination hearing at which The Oath's financial condition prior to Scheur's involvement was hotly contested, and there is conflicting evidence in the record. At the loss hearing, Denise Brignac, the Louisiana Department of Insurance Assistant Chief Examiner, testified that on December 31, 2000, before Scheur's acquisition of the company, The Oath reported being above the statutory reserve requirement and was solvent. She also testified that the plan was "struggling financially" and the owners were considering the option of ceasing business and paying off all outstanding claims. As part Scheur's acquisition of the company, the prior owners had to infuse millions of dollars in additional capital just to complete the transfer of ownership. There was also testimony that in 1999 The Oath was losing millions upon millions of dollars and was on the verge of failure. The company lost $27 million in 1999 alone. Brignac acknowledged that in 1999 the company had under-reserved for claims by the amount of $44 million. Given the contradictory testimony and the hotly disputed nature of the issue, we cannot conclude that the district court clearly erred by finding that The Oath would have suffered catastrophic losses had it been closed rather then permitted to continue in operation and that the amount of loss attributable solely to the defendants could not be reasonably calculated.

As an alternative argument, the Government asserts that the district court improperly calculated the amount of the defendants' gain. Rather than

33

No. 08-31148

basing the gain on Scheur's and McMillan's salaries, as the district court did, the Government urges that the gain should have been the $6.1 million in management fees paid to SMG, Scheur's consulting company. The district court rejected this argument because it concluded that the majority of the management fees were actually used for management of The Oath to pay employees' salaries and other administrative expenses. As such, the fees represented no gain to the defendants. The court reasoned that The Oath was not a sham corporation. Although the defendants' fraud allowed The Oath to continue operating in violation of state regulatory requirements for net worth, the company otherwise was a legitimate business that provided healthcare coverage to its insureds, none of whom ever lost coverage. We agree with the district court's reasoning about the management fees and conclude that they did not represent a gain to the defendants. The district court did not clearly err in its determination of the defendants' gain. *See, e.g., United States v. Smithson*.[87]

Finally, the Government contends that under the Mandatory Victims Restitution Act, 18 U.S.C. § 3663A, the district court was required to order restitution. The district court's decision with respect to restitution is reviewed for an abuse of discretion.[88] A restitution order "must be limited to losses caused by the specific conduct underlying the offense of conviction." *United States v. Arledge*.[89] The award may encompass "only those losses that resulted directly from the offense for which the defendant was convicted."[90] Because we conclude

---

[87] 49 F.3d 138, 144 (5th Cir. 1995) ("compensation for legal services . . . not performed in furtherance of the fraudulent concealment cannot be considered gain to the appellants") (footnote omitted); *cf. Olis*, 429 F.3d at 545–46.

[88] *Ollison*, 555 F.3d at 164; *see also United States v. Gupta*, 572 F.3d 878, 887 (11th Cir. 2009).

[89] 553 F.3d 881, 899 (5th Cir. 2008).

[90] *Id.* at 898 (internal quotation marks and citation omitted).

No. 08-31148

that the district court did not err in determining that the amount of the loss attributable to the defendants' fraud could not reasonably be determined, the district court did not abuse its discretion by finding restitution inapplicable.[91] We therefore find no merit in the Government's cross-appeal of the defendants' sentences.

The district court's judgments are AFFIRMED.

---

[91] *See also* 18 U.S.C. § 3663A(c)(3)(B) (providing that restitution is inapplicable if "determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process").