# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

July 10, 2012

Lyle W. Cayce
Clerk

No. 10-10645

UNITED STATES OF AMERICA,

Plaintiff-Appellee

v.

JIBREEL A. RASHAD,
also known as Vernon Cooks, Jr.,

Defendant-Appellant

Appeals from the United States District Court
for the Northern District of Texas

Before JONES, Chief Judge, and WIENER and GRAVES, Circuit Judges.
EDITH H. JONES, Chief Judge:

Appellant Jibreel Rashad ("Rashad") appeals his conviction and sentence for violating the Hobbs Act in a crude pay-to-play scheme practiced by Dallas, Texas officials against low-income housing developers. We reject his contentions concerning sufficiency of the evidence of conspiracy, and his other issues are meritless.

## BACKGROUND

Rashad was charged in one count of a 31-count indictment against fourteen defendants, including three Dallas public officials, with conspiracy to commit extortion. The trial court granted his motion for severance from the

No. 10-10645

other defendants, and the case against Rashad was tried to a jury for nine days. Following conviction, the court sentenced Rashad to 57 months imprisonment, 12 months of which was to be served concurrently with a 125-month sentence Rashad had received for an unrelated mortgage fraud conviction.

The instant conviction was predicated on Rashad's conspiracy with Ricky Robertson ("Robertson"), a business partner; D'Angelo Lee ("Lee"), a Dallas City Plan and Zoning Commissioner; Donald Hill ("Hill"), a Dallas City Councilman; and Terri Hodge ("Hodge"), a state representative, among others, to extort money and favorable contracts from real estate developer James R. "Bill" Fisher ("Fisher"). Rashad and Roberston conspired with Lee and Hill in an attempt to force Fisher to hire Rashad's company, RA-MILL, to perform construction work on Fisher's company's proposed low-income housing projects in South Dallas.

Hill's and Lee's extortionate demands of Fisher were not, however, limited to a single incident. In 2004 and 2005, Fisher and Brian Potashnik ("Potashnik") were competing for approval from the Dallas City Council and Plan Commission to build tax-advantaged affordable housing development projects. In the summer of 2004, Fisher believed he had "unwavering" support from Councilman Hill, and as a result, invested approximately a half million dollars each in the initial stages of three projects. Fisher's company was on a limited budget and would not have invested in the development projects without secure political support.

Despite Hill's initial assurances, in August, Darren Reagan ("Reagan"), president and CEO of the Black State Employees Association of Texas ("BSEAT"), requested that the City Council place a six-month moratorium on all new affordable housing developments in South Dallas. This delay would have

2

proved disastrous to Fisher's development project and would have spelled ruin for his company's finances. In reality, BSEAT was a sham organization whose main purpose was to raise money for its sole three members. Councilman Hill instructed Fisher to meet with Reagan to deflect BSEAT's opposition to his project. Fisher later agreed to pay BSEAT $100,000 as a "consultant" in one of the projects.

Soon after this episode, Fisher was contacted by Lee and asked to help pay $5,000 in support of a young man's college tuition. Fisher attempted to ascertain if the young man in question was, in fact, the relative of any City of Dallas employee, but could not get an adequate answer. Fisher did not pay the requested money. Fisher later learned that the young man was actually related to either Lee or Hill.

It was also around this time that Fisher began negotiating with Rashad and his business partner, Robertson, for RA-MILL to perform concrete sub-contracting on one of Fisher's projects. Fisher understood that Lee might be a partner in their business, and that Lee wanted Fisher to hire RA-MILL, but was concerned about their lack of construction expertise and experience.

Fisher signed a contract with Reagan in desperation when he learned that Hill might oppose his projects. Nevertheless, on October 27, Hill moved to deny tax credit financing for one of Fisher's development projects and the Council postponed the critical vote. Hill instead moved, and Council agreed, to approve financing for Potashnik's competing developments. (Seven days before the vote, Potashnik had agreed to pay Hill's mistress, Sheila Farrington, $175,000 in "consulting fees.")

No. 10-10645

Shortly thereafter, Lee contacted Potashnik and Fisher and requested contributions for Hill's birthday party, which was in reality a fundraiser. Potashnik agreed to contribute $3,000. Lee requested that Fisher donate $7,500, which Fisher declined to do. Lee left a voicemail for Fisher, pressuring him to contribute and telling Fisher that his deal was "going to be held over two weeks," a statement Fisher took as a threat. Lee's threat became reality when the Plan Commission postponed a vote on zoning one of Fisher's projects on November 4.

At about this same time, Reagan told Fisher that his Pecan Grove housing project was not likely to be approved by the City Council and that he needed to sign another contract with BSEAT in order to gain political support. On the day of the City Council vote, Fisher and Reagan signed a consulting contract for $100,000 in the City Hall parking lot. Reagan walked the document into City Hall. Later that day, Hill moved to approve Fisher's housing project.

At this point, Fisher concluded that Dallas officials, Lee and Hill in particular, were selling their votes for money. He knew he would not be able to stay in business without Council approval and he would not pay for votes. In his words, it "wasn't a level playing field." Motivated by his deep concerns, Fisher and his attorney met with the FBI to discuss his situation. After a second meeting with the FBI, Fisher agreed to cooperate in an investigation of potential corruption at City Hall by recording his interactions with Lee, Hill and others. Fisher began by calling Lee to apologize for not having agreed to Lee's earlier demands.

In December, Lee instructed Robertson and Rashad to meet with Fisher to discuss hiring their company, RA-MILL, as a subcontractor on one of Fisher's projects. Lee insisted to them that he expected Fisher to "keep [his] agreement

4

with these guys . . . and do what he said he was gonna do in that project so [Lee] can push" Fisher's housing deal.  During the meeting, which Fisher recorded for the FBI, Rashad and Robertson explicitly told Fisher that if he hired them for the housing development, Lee would vote in favor of the project.  During this meeting, Rashad and Robertson admitted to Fisher that Lee was a secret partner in RA-MILL and would "get taken care of from the contract."  A couple of weeks after this meeting, Fisher received a voicemail message from Rashad telling him that he was doing what was required for Lee's support.  Lee then voted for Fisher's zoning proposal.

In late December and early January 2005, Rashad sent contracts to Fisher that demanded a 10% up-front payment.  Fisher balked at this request and complained to Rashad that a 1% up-front payment was customary.  Rashad responded that Lee wanted these contracts signed as a way to memorialize their agreement before the upcoming zoning vote.  During this meeting, Rashad again referred to the fact that Lee was a "partner" in their business and reiterated that if Fisher hired RA-MILL for the housing development, Lee and Hill would vote in favor of the project.

Over the next few weeks, Fisher was pressured by Lee, Rashad, and Robertson to finalize his agreement with RA-MILL.  At one point, Reagan interjected himself into the deal and he and Lee created a $180,000 invoice from RA-MILL, which was given to Fisher.  When Fisher expressed continued hesitation with the arrangement and declined to pay, Hill postponed the vote on the housing project in order to gain more leverage over Fisher.  After the postponement, Rashad demanded payment of $80,000 and indicated that Fisher's project would not pass if payment was not made.

No. 10-10645

In the ensuing months, Lee pushed Rashad and Robertson (and RA-MILL) out of the deal, while Reagan moved in again asserting demands for payment to BSEAT. Fisher ultimately paid $22,500 to BSEAT, nearly half of which found its way to Hill via delivery in a church parking lot.

In June, the FBI executed 25 search warrants resulting from this investigation. In the ensuing trial of the original defendants, Hill, Lee, Reagan and Robertson were convicted of charges relating to the extortion of Fisher. Rashad, as noted, was convicted in his severed trial.

Rashad appeals the conviction on a number of grounds, including insufficient evidence, plain errors during the government's closing argument, and that the Hobbs Act is unconstitutionally overbroad and vague.[1] He also appeals his sentence.

## DISCUSSION

## I.    Sufficiency of the Evidence

Rashad contends that there was insufficient evidence to support his conviction under the Hobbs Act for conspiracy to obstruct, delay or affect commerce by extortion. Extortion is defined as "the obtaining of property from another, without his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(a) and (b)(2). "Fear of economic loss" may underlie extortion in this context, *United States v. Edwards*, 303 F.3d 606, 636 (5th Cir. 2002), as does action "under color of official right." Rashad's jury was instructed on both theories of extortion. A reviewing court may set aside the jury's verdict on the ground of insufficient

---

[1] Rashad, however, concedes that this argument is foreclosed by this Court's precedent, but nevertheless wishes to preserve this issue for possible Supreme Court review. *See United States v. Williams*, 621 F.2d 123 (5th Cir. 1980).

No. 10-10645

evidence only if no rational trier of fact could have agreed with the jury. *Cavazos v. Smith*, 132 S. Ct. 2, 4 (2011).  The facts supporting conviction are viewed in the light most favorable to the government as prevailing party.

*A.  Fear of Economic Harm*

Extortion induced by means of wrongful fear of economic harm must involve a particular loss, not merely a loss of future benefit or advantage in an otherwise fair competition.  *Edwards*, 303 F.3d at 635.  Extortion of this type also occurs where the victim believes that he will lose an investment if he does not cooperate with the perpetrator's demands.  *See United States v. Tomblin*, 46 F.3d 1369, 1385 (5th Cir. 1995).  Rashad argues that there is insufficient evidence to show that Fisher was reasonably in fear of economic harm because Rashad obtained neither money nor property from Fisher, and the zoning vote on the Dallas West Village project only constituted a potential future benefit, not an actual loss to Fisher.

These arguments are unpersuasive.  That Rashad received no money from Fisher is irrelevant, because he conspired with others — including Robertson, Lee and Hill — to demand payments.  The evidence abundantly shows Rashad shaking down Fisher for a deal with RA-MILL that would serve as a conduit to Lee.

As to Fisher's fear of economic harm, Rashad and others created an environment in which Fisher would be unable to compete if he did not accede to the extortionate demands.  *Edwards* establishes that a victim has a reasonable fear of economic loss when his refusal to pay the extortionate demand will result in his loss of "the right to compete at all" rather than simply return him to "a level playing field."  *Edwards*, 303 F.3d at 636.  Substantial and compelling

evidence supports that Fisher truly and reasonably believed that if he did not hire Rashad's company, RA-MILL, then both Lee and Hill would vote against Fisher's West Dallas zoning request.  The repeated delays on the project votes, combined with the negative votes, threatened Fisher with the loss of a half million dollar investment in that project alone if he refused to meet Rashad's demands.  Sufficient evidence existed for the jury to convict Rashad for conspiracy under the "fear of economic harm" theory of the Hobbs Act.

### B.  Under Color of Official Right

Usually, only public officials are charged with extorting property under color of official right.  *Tomblin*, 46 F.3d at 1382.  In *Tomblin*, the defendant won a new trial because he practiced extortion as a private individual claiming to exert influence over public officials, but he received the payments for himself alone.  *Tomblin*, 46 F.3d at 1382-83.  Rashad contends that because he, too, is a private citizen, he cannot be guilty of extortion "under color of official right." This argument misapprehends *Tomblin* and our circuit precedent.  Tomblin was charged with conspiracy to extort under color of official right, not with the underlying substantive offense.  Rashad's participation in an illegal agreement with public officials who were practicing extortion suffices to establish conspiratorial guilt.  In various cases, courts have applied the "under color of official right" theory to private individuals who conspired with corrupt public officials, masqueraded as public officials, aided or abetted extortion by public officials, or were speaking for a public official.  *See, e.g.*, *United States v. Rubio*, 321 F.3d 517, 527 (5th Cir. 2003) (private bail bondsman conspired with public official who received bribes); *United States v. Box*, 50 F.3d 345, 351 (5th Cir. 1995) (bail bondsman guilty of Hobbs Act conspiracy to extort "under color of

official right" because he conspired with public officials on the take); *Tomblin*, 46 F.3d at 1382-83 (citing cases). There is compelling evidence that Rashad, Lee and Hill were acting in concert with one another, that Fisher knew Rashad was acting with the backing of the two public officials, and that Lee and Hill would benefit from Fisher's dealings with Rashad. Fisher was fully aware that Lee was a partner in RA-MILL, and Hill delayed a vote on Fisher's housing project in order to force Fisher to make payments to RA-MILL. Rashad was in the middle of the city officials' shake-down efforts, and those officials were indicted and convicted for their misdeeds against Fisher. The requisite "color of official right" was established in this conspiracy.

## II. Prosecution's Closing Arguments

Rashad further contends that, in its closing arguments, the prosecution made inappropriate comments about his guilt, truthfulness and character that constituted plain errors requiring reversal. When, as here, there are no timely objections to statements made by the prosecution, this court reviews them for plain error. *United States v. Gracia*, 522 F.3d 597, 599 (5th Cir. 2008). Plain error exists when the defendant can demonstrate that (1) there was an error or defect; (2) it is plain; and (3) it affected the defendant's substantial rights. *Id.* at 600. Even when the defendant meets this burden, the court still has discretion to decide whether or not to reverse, and will generally not do so unless the plain error seriously affected the fairness, integrity, or public reputation of the judicial proceeding. *Id.* Three factors inform whether this kind of prosecutorial misconduct constitutes a reversible error: (1) the magnitude of the prejudicial effect of the prosecutor's remarks; (2) the efficacy of any cautionary instruction by the judge; and (3) the strength of evidence supporting the

No. 10-10645

conviction. *United States v. Thompson*, 482 F.3d 781, 785 (5th Cir. 2007). When analyzing the impropriety of prosecutorial comments, the central issue for this court is "whether the prosecutor's remarks cast serious doubt on the correctness of the jury's verdict." *Gracia*, 522 F.3d at 603. This step "sets a high bar." *Id.*

Rashad claims that the prosecutor committed reversible error when, in closing arguments, he stated that Rashad was not a "legitimate person"; analogized his actions to those of violent drug dealers; and referred to Rashad as a "thief." Rashad asserts that these statements violate this court's oft-repeated standard that prosecutors may not use their closing arguments to express opinions about the validity of a witness's statements or the guilt of a defendant. *See e.g., Gracia*, 522 F.3d at 606-07 (holding that prosecutor committed plain error requiring reversal when he made guarantees about the veracity of testimony that was the substantive basis of the case against a defendant).

In contrast with *Gracia*, however, the prejudicial effect of these comments was small. The prosecution in this case presented ample evidence of Rashad's guilt aside from any assertions made about his status or character in closing statements. Further, while the alleged confession in *Gracia* had been neither recorded nor transcribed, the prosecution here possessed numerous recordings and messages among Rashad and the other defendants discussing their conspiracy to extort money from Fisher.

The government responds that Rashad has not demonstrated any error in the three comments. The context surrounding the first two challenged statements supports the government's position, but the prosecutor need not have identified Rashad by a reference to thieves. However, in light of the quantity of

10

No. 10-10645

evidence against Rashad, this sole arguable misstep did not affect the defendant's substantial rights and was not prejudicial.

## III. Reasonableness of Sentencing

Rashad contends that the district court unreasonably imposed 45 months of his sentence to run consecutively to a previous sentence he received for a separate, unrelated crime. Rashad asserts that this sentence was not only unreasonable but an abuse of discretion that necessitates remand for another sentencing hearing.

Under *United States v. Booker*, 543 U.S. 220, 125 S. Ct. 738 (2005), this Court reviews sentences for "reasonableness" measured against the factors listed in 18 U.S.C. § 3553(a). *United States v. Smith*, 440 F.3d 704, 706 (5th Cir. 2006). Sentences within the guideline range are presumptively reasonable on appeal. *United States v. Newson*, 515 F.3d 374, 379 (5th Cir. 2008). Reasonableness may be rebutted by showing that the sentence does not account for factors that should receive significant weight, gives significant weight to irrelevant or improper factors, or represents a clear error of judgment in balancing sentencing factors. *United States v. Nikonova*, 480 F.3d 371, 376 (5th Cir. 2007), *abrogation on other grounds recognized by United States v. Delgado-Martinez*, 564 F.3d 750, 752 (5th Cir. 2009). When a sentence is procedurally sound, appellate review is guided by the abuse-of-discretion standard. *Newson*, 515 F.3d at 379 (citing *Gall v. United States*, 552 U.S. 38, 128 S. Ct. 586, 597 (2007)). Rashad, however, did not object in the district court to the reasonableness of his sentence. Accordingly, we review the sentence for plain error. *United States v. Peltier*, 505 F.3d 389, 391-92 (5th Cir. 2007).

No. 10-10645

Rashad claims that the sentence imposed on him by the district court was unreasonable under 18 U.S.C. § 3553(a) and U.S.S.G. § 5G1.3. Under 18 U.S.C. § 3553(a), the court is required to consider a number of factors when imposing a sentence. Rashad claims that the court did not adequately consider the statutory factors. He contends that the court only mentioned that he had been a model prisoner with no disciplinary issues and made no factual findings on which to base its decision. This contention is patently wrong. The district court expressly discussed each of the Section 3553(a) factors when determining Rashad's sentence. The counter-arguments Rashad voices on appeal were well known to the district court and were rejected.

Under U.S.S.G. § 5G1.3, in a case involving an undischarged term of imprisonment, the court may impose a sentence to run concurrently, partially concurrently, or consecutively to the prior undischarged term of imprisonment in order to achieve a reasonable sentence. In sentencing Rashad to 57 months, 12 of which are to run concurrently with his mortgage fraud sentence, the court applied a guideline range of 57-71 months imprisonment. In light of the guidelines range, and the statutory maximum of 20 years, the court's 57-month sentence was at the bottom of the advisory range. And the court recognized Rashad's good behavior in prison by allowing 12 months to run concurrently with his earlier sentence.

Rashad cannot show that his sentence was unreasonable, let alone plain error.

## CONCLUSION

For these reasons, the judgment and sentence of the district court are **AFFIRMED**.