# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 17-10117

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

OLGA SANDRA MURRA, also known as Sandra Olga Capon-Meneses,

Defendant-Appellant.

United States Court of Appeals
Fifth Circuit

**FILED**
January 12, 2018

Lyle W. Cayce
Clerk

Appeal from the United States District Court
for the Northern District of Texas

Before DENNIS, CLEMENT, and GRAVES, Circuit Judges.

JAMES E. GRAVES, JR., Circuit Judge:

In August 2016, Defendant-Appellant Olga Murra was convicted by a jury of two counts of forced labor, in violation of 18 U.S.C. § 1589(a), and two counts of harboring an illegal alien for profit, in violation of 8 U.S.C. §§ 1324(a)(1)(A)(iii) and 1324(a)(1)(B)(i), based on conduct toward her half-sister Vania Rodriguez and quasi–adopted family member Ingrid Guerrero. The district court sentenced her to seventy-two months' imprisonment. Murra now appeals from that conviction and sentence, claiming that (1) the district court erred by admitting the testimony of the Government's expert witness; (2) the Government prosecutor improperly commented on her decision not to testify; (3) the district court erred in ruling that Mosaic Family Services, Inc., a nonprofit organization that provided both counseling and legal services to the victims, did not have to produce documents

No. 17-10117

that Mosaic contends are protected by psychotherapist-patient or attorney-client privilege; and (4) the district court erred by imposing a "vulnerable victim" enhancement to her sentence. For the reasons that follow, we affirm.

## I

According to the evidence and testimony presented at trial, Murra used psychological manipulation, mental and physical abuse, and threats of abuse to coerce both Vania and Ingrid to work for her without pay for over a decade.

## A

Around 1985, while living in Mexico, Murra and her family (her children and now-deceased husband) met Ingrid Guerrero and her three sisters—Tania, Yuriria, and Jehan—who were living apart from their mother and father because of a tumultuous home life. A few years into their relationship with Murra, the Guerreros began attending church at Murra's home, with Murra "preaching" and leading the services. Murra later told the sisters that they should move out of their house and live with her, which they did.

Shortly thereafter, Murra began to inflict physical and psychological abuse on the Guerreros. Murra would hit them with a wooden paddle almost daily as punishment for being "obscene" or "rebellious," or if they didn't agree with something she said. She made Ingrid sit in baths of ice water because she wasn't "pure." She forced the sisters to sleep in the laundry room, at times for up to a week, because she felt they needed to repent for their "sins." She would slap the sisters, cut their hair, and tell them "nobody will love you."

Murra told the sisters that "she was a prophet from God." Based on this, they believed that whatever Murra said came directly from God. They were ordered to cut off ties with their family, which they did—leaving them completely dependent on Murra.

Vania was in medical school during the time Murra lived in Mexico. Vania and Murra used to communicate via letter, and at one point the content of Murra's

No. 17-10117

letters became increasingly more religious. Murra claimed she was a prophet of God and would communicate prophecies to Vania. One of Murra's "prophecies" was that Vania had to end the relationship with the man she was dating because the marriage would be without God's consent or approval; she also told Vania that the man could beat or kill her, and that if they had a child together the child would be sick. Vania left the man as a result and returned to Mexico. Vania never practiced medicine because Murra told her that God did not want her to do so. While living in Mexico, Vania witnessed Murra's nightly paddling of the Guerreros. Murra instructed Vania to paddle the sisters or risk being punished herself. Murra also occasionally paddled Vania.

Ingrid, her sisters, and Vania were forced to work in Murra's husband's factory making jeans five or six days a week. And while they were ostensibly paid for their work, all of their wages went to Murra.

## B

Claiming that "God had told her to come to the promise[d] land," Murra—who is a U.S. citizen—moved with her children to El Paso, Texas, in 1997. The Guerreros stayed behind in Mexico to work in the jeans factory, and Ingrid took care of Murra's husband for no compensation. Murra facilitated the Guerreros' illegal passage into the United States in 1998. Vania entered the country illegally a year later. While in the United States, Murra retained Vania and Ingrid's identification documents and birth certificates. The Guerreros did not have beds in the house in El Paso and had to sleep on the floor or, as punishment, in the garage. Ingrid delivered flyers and cleaned houses for Murra, who retained all of the money Ingrid earned.

Murra moved the group from El Paso to Fort Worth in 1999. Once in Fort Worth, Ingrid and her sisters delivered flyers advertising a house-cleaning service, and they and Vania began cleaning houses. They cleaned three or four houses a day, six days a week. Clients would pay by cash or by checks made out

to Murra, and Murra would retain all the money they earned. They would not hold back from Murra the money they were given by clients out of fear of punishment. Ingrid also was forced to obtain employment as a cashier at McDonald's and Wal-Mart under a false name and using false identification documents that Murra had supplied. Oftentimes, Ingrid would clean houses and work as a cashier on the same day—getting only four hours of sleep at night.

During the twelve years Ingrid lived in Fort Worth with Murra, she never had a bed or bedroom; she was forced to sleep on the floor. Murra continued to send the Guerreros to sleep in the garage as punishment, as she had done in El Paso. When confined to the garage, which was neither heated nor cooled, the Guerreros would have to request permission to use the bathroom.

Murra constantly reminded the Guerreros that they were in the country illegally and that they had no papers. Vania testified that she eventually confronted Murra about her treatment of the Guerrero sisters; Murra responded by subjecting Vania to the same treatment from then on. Murra threatened Vania with immigration consequences, as well, telling her she had nowhere to go because "immigration is going to . . . grab you, they are going to get you and then they are going to put you in this casket and they are going to bury you alive." Vania testified that she was so indoctrinated by Murra that she believed that federal immigration officials would treat an illegal alien in that way.

Murra continued to exert religious-based influence over Vania and the Guerreros. The Government proffered a tape recording that Murra made concerning the victims' purported religious failings. On the recording, Murra stated (translated from Spanish), "I'm good before God because I speak the will of God." She accused the women of existing in a "vicious circle of mistakes and mistakes and self-pity and laziness" and told them they were destined for hell (an accusation that Ingrid testified Murra made every day during the years she lived with Murra).

Over time, several of Murra's house cleaning clients began to notice signs of abuse, and the victims confided in them about Murra's treatment. Alicia Richardson testified to her belief that Vania lost at least thirty pounds during her employment and that she looked "very thin and frail" and "unhealthy." Vania eventually told Richardson that she was not being fed, that she would not be paid for her cleaning work, and that Murra maintained her immigration papers, which caused Vania fear regarding her immigration status. Richardson offered to have Vania come live with her family, and she and her husband would pay Vania to watch their children, but Vania was "scared to death" that Murra would have her sent back to Mexico. Marsia Blackwell, another client, also testified as to Vania's weight loss. Blackwell noticed Vania's "progression of degradation . . . mentally, physically, emotionally." Eventually, Vania emotionally recounted to Blackwell the details of Murra's punishment, including that she was prohibited from using the refrigerator at home and was given rotten food to eat.

Linda Ziegler, for whom Ingrid provided cleaning services from 2001 to 2011, testified that Ingrid looked "very thin" and that she would clean her house despite appearing sick. Ingrid told Ziegler about the abuse she suffered and how she was not allowed to keep the money she earned, but she was afraid of having nowhere to live and nowhere to go. John Angle, for whom Ingrid provided cleaning services between 2008 and 2011, testified that Ingrid frequently looked "run down" while cleaning his house and would clean despite being "clearly . . . ill."

Vania testified that the money the victims earned from house cleaning went to fund cosmetic procedures for Murra. The Government's analysis of Murra's expenditures between February 2009 and May 2011 indicated that her spending, made possible by revenue from the victims' house cleaning, included thousands of dollars spent on salons, cosmetics, other health and beauty products, clothes, and home-improvement items. Review of these accounts during this period revealed no checks written or other transfers to Ingrid, despite $287,000

No. 17-10117

of cleaning revenues in that twenty-seven-month period.

## C

Vania left Murra's home in October 2006, preferring the unknown to "dying in this hell."[1] Marsia Blackwell brought Vania to stay with her until she was up on her feet. Vania revealed later in group counseling sessions that Murra had allowed her no personal freedoms and punished her by putting her in the garage and depriving her of food and water. She also explained that Murra would use scripture to curse her and threaten her with an eternity in hell.

Ingrid left in 2011, after feeling trapped and having suicidal thoughts. One witness who saw Ingrid thereafter, Margarita Delosantos, testified that Ingrid was extremely upset and fearful. Ingrid recounted to Delosantos the abuse she suffered—that Murra subjected her to ice baths, beatings, verbal abuse, and spiritual threats. She also told Delosantos about Murra's practice of segregating her and her sisters to certain areas of the house and depriving them of food.

Ingrid and Vania both eventually sought help from a nonprofit organization, Mosaic Family Services, Inc. ("Mosaic"), which specializes in immigration-related legal and counseling services. Mosaic ultimately referred this case to the Government for prosecution.

## D

Murra was charged with two counts of forced labor and two counts of harboring an illegal alien for profit, based on her treatment of Vania and Ingrid. Both the Government and Murra submitted evidence and testimony, though Murra elected not to testify in her own defense. At the close of the five-day trial, the jury found Murra guilty on all counts. The district court entered judgment on January 27, 2017, and Murra timely filed a notice of appeal.

We have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

---

[1] Tania Guerrero left Murra's home in 2000. Both Yuriria and Jehan left in 2004.

6

No. 17-10117

## II

We now briefly summarize the facts pertinent to each of the issues on appeal.

## A

Prior to trial, the Government served notice that it intended to call as an expert witness Dr. Shannon Wolf, a Professor of Psychology and Counseling at Dallas Baptist University, to testify regarding

> the dynamics of abusive relationships, explaining why victims frequently remain with individuals who have mistreated or abused them and the contributing factors that may make an individual more susceptible to control, manipulation, or mistreatment by another. She will also testify regarding trauma bonds, to include what they are, how they form, and why they can be so powerful.

Murra filed a motion to exclude her testimony under Federal Rule of Evidence 702. Following a *Daubert*[2] hearing, the district court denied the motion and admitted Dr. Wolf as an expert, finding that her "proposed testimony on the 'general concept' of trauma bonds is admissible," and that her "professional experience, personal observations, and education qualif[ied] her" to testify as to the concept.

Dr. Wolf testified generally at trial about trauma bonds. She described trauma bonding as "a very powerful emotional connection between someone who is being abused and their abuser or perhaps a captive and a captor and it's mitigated by a series of traumatic events, traumatic situations." She further detailed that in trauma bonding "the abused person not only attaches to the abuser but to other people in the house, so they try to please this abuser, that's part of this relationship, and it's one of a very strong power differential where one person has a lot of power and the abused person has almost no power." She discussed factors that are involved in developing a trauma bond (such as age), the strength

---

[2] *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).

of a trauma bond, and the general thought processes of victims who are connected to their abusers via a trauma bond. Dr. Wolf's testimony included no application of the principles and methods underlying that testimony to the facts of this case.

### B

Also prior to trial, Murra subpoenaed Mosaic, requesting documents related to services it had furnished to the victims. After Mosaic tendered the documents requested in the subpoena in part, along with a privilege log, Murra moved for Mosaic to be held in contempt. The district court ordered Mosaic to appear for a hearing and to bring the challenged documents to court.

At the hearing, Meijken Westenskow, Mosaic's Legal Program Director, brought only the documents which Mosaic claimed were protected by attorney-client privilege. Mosaic later produced to the court, through Licensed Professional Counselor–Intern Mara Watkins, the documents it claimed were protected by the psychotherapist-patient privilege. The court reviewed the documents *in camera* and ruled that all of the documents in question were covered by their respective privileges.[3]

### C

After the close of evidence and prior to closing arguments, the judge read the jury instructions. Those instructions included the following two statements: "The defendant begins with a clean slate. The law does not require the defendant to prove her innocence or produce any evidence at all and no inference whatsoever may be drawn from the election of the defendant not to testify"; and "[A]lways bear in mind that the law never imposes upon a defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence."

During his rebuttal closing argument, the prosecutor made the following statement: "And let's step back and let's talk about credibility, folks, because

---

[3] The documents were submitted to this court ex parte and under seal.

that woman sitting there, she has an absolute[] right not to testify. You heard about that . . . ." Defense counsel immediately objected and moved for a mistrial, to which the court responded, "I will sustain the objection. I will ask the jury to please disregard the last statement of the prosecutor and I will refer the jury to page 2 of the jury charge." The prosecutor then clarified that his remark was intended to address the credibility of the defense witnesses who had testified:

> And folks, you need to follow those instructions. You all committed to that in voir dire. You said that you could follow that rule and you must. But the defendant in this case[] has chosen to put on a case and you have an absolute[] right to judge the credibility of that case which is what I was trying to say. Do you understand that distinction? You can't hold anything against her but you can judge the credibility of the witnesses that she put on the stand.
>
> And let's talk about the credibility of those witnesses. . . .

From there, the rebuttal continued through to its conclusion without incident.

**D**

The Pre-Sentence Report added two points to Murra's proposed offense level under U.S. Sentencing Guideline § 3A1.1(b)(1) because Murra knew or should have known the victims of the offenses were vulnerable victims. The PSR supported this conclusion by explaining that the Guerreros were between six and eleven years old when Murra began "grooming" them. It also outlined how Murra used religion to manipulate them. And it explained that Murra kept the Guerreros' legal documents, school records, and family photos, and that she threatened Vania with calls to immigration authorities because Vania was not legally in the United States. With other enhancements, Murra's total offense level was 31, and the PSR set her guideline sentencing range at 108 to 120 months.

Murra objected to the recommendation that the "vulnerable victim" enhancement be imposed. The PSR Addendum recommended that the district court overrule the objection, emphasizing that Murra began "grooming" the victims in childhood and arguing that the continued mental, physical, and spiritual abuse

made the victims "continually vulnerable." Murra responded that application of the enhancement based on the victims' immigration status would be improper because the vulnerability attendant to being an illegal alien is taken into account in the base offense of harboring an illegal alien. At the sentencing hearing, the district court overruled Murra's objections and imposed the enhancement, sentencing Murra to seventy-two months' imprisonment.

## III

We first address Murra's challenge to the district court's admission of Dr. Wolf's expert testimony under Rule 702. We review a trial court's decision to admit expert testimony for abuse of discretion. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 139 (1997). "A trial court abuses its discretion when its ruling is based on an erroneous view of the law or a clearly erroneous assessment of the evidence." *Brown v. Ill. Cent. R.R. Co.*, 705 F.3d 531, 535 (5th Cir. 2013) (citation omitted). If we find an abuse of discretion, we are not to reverse the district court's ruling unless it affected the complaining party's substantial rights. *Moench v. Marquette Transp. Co. Gulf-Inland, L.L.C.*, 838 F.3d 586, 594 (5th Cir. 2016). A complaining party can demonstrate that her substantial rights were affected by a district court's erroneous evidentiary ruling if she demonstrates that the ruling affected the outcome of the proceedings in the district court. *See Mahmoud v. De Moss Owners Ass'n*, 865 F.3d 322, 327–28 (5th Cir. 2017). An error does not affect substantial rights if the court is "sure, after reviewing the entire record, that the error did not influence the jury or had but a very slight effect on its verdict." *Carlson v. Bioremedi Thearpeutic Sys., Inc.*, 822 F.3d 194, 202 (5th Cir. 2016) (quoting *Kelly v. Boeing Petrol. Servs., Inc.*, 61 F.3d 350, 361 (5th Cir. 1995)).

Murra argues that the admission of Dr. Wolf's expert testimony was based on the district court's erroneous view of Rule 702, which permits witnesses who are qualified as experts by knowledge, skill, experience, training, or education to testify in the form of an opinion or otherwise if (a) "the expert's scientific,

technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue"; (b) "the testimony is based on sufficient facts or data"; (c) "the testimony is the product of reliable principles and methods"; and (d) "the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. The Government, however, points us to the advisory committee note to the 2000 amendments to Rule 702, which contemplates a circumstance arising in some cases where it "might also be important . . . for an expert to educate the factfinder about general principles, without ever attempting to apply these principles to the specific facts of the case." Fed. R. Evid. 702 advisory committee note. In such a circumstance, "Rule 702 simply requires that: (1) the expert be qualified; (2) the testimony address a subject matter on which the factfinder can be assisted by an expert; (3) the testimony be reliable; and (4) the testimony 'fit' the facts of the case." *Id.*

The district court did not explicitly base its admission of Dr. Wolf's testimony on this method—it ruled that the testimony was admissible because this court had previously recognized expert testimony on "return-to-the-abuser behavior"—but its ruling was inherently based on the method's factors, especially considering that Dr. Wolf did not apply her testimony to the facts of the case. The court found that Dr. Wolf was qualified, her testimony on trauma bonds addressed a subject matter on which the jury could be assisted, her testimony was reliable, and her testimony was relevant to the facts the Government alleged.

We have had no occasion to address a trial court's use of the advisory committee note's method for admitting expert testimony. But we need not address it here, because even assuming, without deciding, that the district court's admission of Dr. Wolf's testimony ***was*** an abuse of discretion, Murra fails to show that that abuse of discretion affected her substantial rights.

Murra did not brief this portion of the issue. She raised the argument that the district court's admission of Dr. Wolf's testimony was an abuse of discretion,

but she neglected the fact that a mere finding that the district court abused its discretion does not end the analysis or result in automatic reversal. The claim is therefore abandoned due to inadequate briefing. *Cinel v. Connick*, 15 F.3d 1338, 1345 (5th Cir. 1994).

Even had Murra briefed the argument, the argument would still fail. Murra proffered her own expert, Dr. Daphny Ainslie, a licensed psychologist and instructor at Texas State University whose research focuses on trauma (including women's trauma and trauma regarding Mexican immigration), who countered Dr. Wolf's testimony by testifying about both the concept of trauma generally and what she perceived to be a lack of reliable research on the viability of the "trauma bond" concept. More importantly, Dr. Wolf's testimony was not at all critical to proving the Government's case. The Government never referred to Dr. Wolf after she completed her testimony (including in its closing argument) and never referred to the trauma bonds concept following Dr. Ainslie's testimony (including in its closing argument). Based on this, Murra could not show that the admission of Dr. Wolf's testimony affected her substantial rights. *Cf. Carlson*, 822 F.3d at 202 (concluding that plaintiffs' substantial rights were affected when district court abused its discretion by admitting defense's expert testimony without performing a *Daubert* inquiry, because the district court denied defendants' motion for judgment as a matter of law at the close of the plaintiffs' case-in-chief, the expert was the defense's sole witness, and defense counsel relied on the expert's testimony during closing argument).

Accordingly, we conclude that the district court did not abuse its discretion in admitting Dr. Wolf's testimony.

## IV

Murra next claims that the district court erred by permitting Mosaic to withhold documents from her under the psychotherapist-patient and attorney-client privileges.

## A

We review factual findings underlying a ruling of psychotherapist-patient privilege for clear error, and we review application of the legal principles *de novo. United States v. Auster*, 517 F.3d 312, 315 (5th Cir. 2008). A district court's factual finding is clearly erroneous "if, on the entire evidence, we are left with a 'definite and firm conviction' that a mistake has been committed." *United States v. Brown*, 650 F.3d 581, 588 (5th Cir. 2011) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)).

The Supreme Court first recognized the existence of a psychotherapist-patient privilege in federal law in *Jaffee v. Redmond*, 518 U.S. 1 (1996), when it held that "a privilege protecting confidential communications between a psychotherapist and her patient 'promotes sufficiently important interests to outweigh the need for probative evidence.'" *Id.* at 9–10 (quoting *Trammel v. United States*, 445 U.S. 40, 51 (1980)). The privilege "covers ***confidential*** communications made to licensed psychiatrists and psychologists . . . [and] ***confidential*** communications made to licensed social workers in the course of psychotherapy." *Id.* at 15 (emphases added). Murra asserts that the district court's application of the psychotherapist privilege was error on two grounds.

She first argues that the Government has not provided evidence that the victims made any communications to a licensed psychotherapist or social worker. As just outlined above, *Jaffee* made clear that an essential premise of the psychotherapist privilege is that the challenged communications must have been made to a licensed psychiatrist, licensed psychologist, or licensed social worker in the course of psychotherapy. *Id.* That said, our review of the sealed documents reveals no clear error in the district court's factual finding that the communications in the documents were made in the course of psychotherapy to licensed psychologists or license-eligible individuals under the supervision of licensed psychologists.

No. 17-10117

Murra next argues that the victims waived any communications purportedly protected by the psychotherapist privilege because the victims "knew that the information regarding their allegations of human trafficking would be relayed to third parties, namely, immigration services, and the government for purposes of prosecution." This argument is based on the incorrect assumption that an individual forfeits the psychotherapist privilege when she divulges information to her psychotherapist that amounts to allegations that a crime has been committed. The mere assertion that "facts" were disclosed to third parties and at trial does not by itself establish that the victims—or their psychotherapists—disclosed the substance of any *confidential* communications. A defendant does not get to crack open every confidential communication with a victim's psychotherapist simply because that victim may have discussed facts with her psychotherapist that are relevant to the issues at trial. To paraphrase the Supreme Court's language in *Upjohn Co. v. United States*, 449 U.S. 383, 395–96 (1981): although a patient may not refuse to disclose any relevant fact within her knowledge merely because she discussed those facts in a confidential communication with her psychotherapist, she cannot be compelled to answer the question, "What did you say to your psychotherapist?"

Our review of the confidential communications reveals no relevant underlying fact discussed in the victims' psychotherapy sessions that was not fully explored during the victims' testimony and cross-examination at trial. The victims were forthcoming in their testimony about their recollection of those facts, and no victim attempted to hide behind the privilege to avoid giving testimony about those facts. The victims had a "reasonable expectation of confidentiality" in their confidential communications with their psychotherapists, and there is nothing in the record to show that any portion of those confidential communications was revealed by Mosaic to any third party, *cf. Auster*, 517 F.3d at 319 (finding no reasonable expectation of confidentiality in defendant's communication

14

No. 17-10117

to his therapist of violent threat against third parties where defendant had actual knowledge that his threats were not confidential); *United States v. Lara*, 850 F.3d 686, 691 (4th Cir. 2017) (finding waiver of the privilege where the patient signed a form authorizing treatment providers to have "unrestricted communication" with the state probation department regarding "any . . . information deemed necessary to protect the community"),[4] or by the victims themselves, *cf. Koch v. Cox*, 489 F.3d 384, 391 (D.C. Cir. 2007) (explaining that a patient waives the privilege where she "selectively disclose[s] part of a privileged communication in order to gain an advantage in litigation" (citation and internal quotation marks omitted); *Nguyen v. Excel Corp.*, 197 F.3d 200, 206 (5th Cir. 1999) (holding, in the analogous attorney-client privilege context, that a client "implicitly waives the attorney-client privilege by testifying about portions of the attorney-client communication").

The singular conclusion arising from this discussion is that Murra has failed to establish waiver. Murra cannot be permitted, as she seeks, to review confidential communications and ***then*** advise the court of the harm she suffered as a result of the withholding. *See Kinder v. White*, 609 F. App'x 126, 131 (4th Cir. 2015) ("[N]ow that the psychotherapist privilege has been recognized, it would be both counterproductive and unnecessary for a court to weigh the opponent's evidentiary need for disclosure any time the privilege is invoked."). We find that the district court's application of the privilege was not error.

**B**

"The application of the attorney-client privilege is a 'question of fact, to

---

[4] In fact, Mosaic is bound by law not to reveal confidential information relating to the victims, as victims of trafficking, to third parties. *See* 8 U.S.C. § 1367(a)(2) (imposing penalties for disclosure of confidential information relating to immigrants who are victims of trafficking); 8 U.S.C. § 1101(a)(15)(T) (applying Section 1367 to victims of severe trafficking); 8 C.F.R. § 214.11(p)(3) (non-governmental agencies that receive information from trafficked victims "are bound by the confidentiality provisions and other restrictions set out in 8 U.S.C. § 1367").

be determined in the light of the purpose of the privilege and guided by judicial precedents.'" *In re Auclair*, 961 F.2d 65, 68 (5th Cir. 1992) (quoting *Hodges, Grant & Kaufmann v. United States*, 768 F.2d 719, 721 (5th Cir. 1985)). We apply the clearly erroneous standard of review, as we did in the context of the psychotherapist-patient privilege, and review the district court's application of the controlling legal standards *de novo. King v. Univ. Healthcare Sys., L.C.*, 645 F.3d 713, 721 (5th Cir. 2011).

"For a communication to be protected under the [attorney-client] privilege, the proponent 'must prove: (1) that he made a ***confidential*** communication; (2) to a lawyer or his subordinate; (3) for the primary purpose of securing either a legal opinion or legal services, or assistance in some legal proceeding.'" *EEOC v. BDO USA, L.L.P.*, 876 F.3d 690, 695 (5th Cir. 2017) (emphasis added) (quoting *United States v. Robinson*, 121 F.3d 971, 974 (5th Cir. 1997)). The record shows that the district court reviewed the pertinent documents and reasonably relied upon the representations made by Mosaic's custodian in determining that the attorney-client privilege attached to the victim's confidential communications with Mosaic's attorneys and/or to subordinates of those attorneys, which were made for the primary purpose of securing legal services pertaining to human trafficking. We find no clear error in that determination.

Murra argues here, as well, that because the victims relayed facts to Mosaic attorneys that were later relayed to the Government and third parties, and that were later testified to at trial, the privilege has been waived. Public disclosure of facts does not destroy the attorney-client privilege with respect to confidential communications ***about*** those facts. *United States v. El Paso Co.*, 682 F.2d 530, 538 n.10 (5th Cir. 1982). None of the testimony the victims gave regarded ***confidential*** communications any of the victims had with Mosaic attorneys. The victims' testimony that they sought legal services from Mosaic because they believed they may be the victims of human trafficking does not amount to a waiver

No. 17-10117

of the confidential communications attendant to those services. The victims have not, as Murra argues, disclosed a "significant portion of a confidential communication." Rather, they have not disclosed *any* portion of their confidential communications, so there is no basis on which to rule that the privilege was waived.[5] Accordingly, we find that the district court's application of the attorney-client privilege similarly was not error.

## V

We turn now to Murra's challenge to the prosecutor's comment during rebuttal closing argument. Murra argues that the comment—"And let's step back and let's talk about credibility, folks, because that woman sitting there, she has an absolute[] right not to testify"—was a constitutionally impermissible remark on her decision not to testify in her own defense.

The Fifth Amendment forbids comment by the prosecution, either direct or indirect, on the accused's silence. *Griffin v. California*, 380 U.S. 609, 615 (1965); *United States v. McMillan*, 600 F.3d 434, 452 (5th Cir. 2010). Review of an assertion a Fifth Amendment violation on this ground involves two steps, each of which requires its own analysis.

## A

We first decide whether the prosecutor made an impermissible remark.

---

[5] Murra's other waiver arguments similarly fail. First, she argues that Vania waived attorney-client privilege because she testified that, to the best of her knowledge, she did not have an attorney. But Vania's negative answer to the question "So you don't have a lawyer?" did not involve any disclosure of confidential communications and did not involve any disclaimer that previous communications with Mosaic attorneys were privileged. Moreover, this argument ignores a stipulation, entered into by both Murra and the Government at trial, that a Mosaic attorney had provided legal services to the victims, including Vania. And second, Murra contends that Ingrid waived the privilege by testifying to the fact that Mosaic is assisting her in obtaining a T visa as a victim of human trafficking. Though Ingrid testified that she was seeking a T visa with Mosaic's assistance, she did not testify *about* the discussions she had with Mosaic's attorney in seeking a T visa.

17

"[T]he test for determining whether the prosecutor's remarks were constitutionally impermissible is: (1) whether the prosecutor's manifest intent was to comment on the defendant's silence or (2) whether the character of the remark was such that the jury would naturally and necessarily construe it as a comment on the defendant's silence." *Rhoades v. Davis*, 852 F.3d 422, 432–33 (5th Cir. 2017) (quoting *United States v. Bohuchot*, 625 F.3d 892, 901 (5th Cir. 2010)). But "[i]f there is an 'equally plausible explanation for the remark,' the prosecutor's intent is not manifest." *United States v. Green*, 324 F.3d 375, 382 (5th Cir. 2003) (quoting *United States v. Grosz*, 76 F.3d 1318, 1326 (5th Cir. 1996)). The defendant bears the burden of proving the prosecutor's intent. *United States v. Laury*, 985 F.2d 1293, 1303 (5th Cir. 1993).

Murra argues that the direct comparison and contrast offered by the prosecutor's comment between credibility ("let's talk about credibility, folks . . . ") and the election not to testify (". . . because that woman sitting there, she has an absolute[] right not to testify.") would naturally and necessarily be taken as a comment on her failure to testify. To Murra, the obvious and natural suggestion from that comparison is that, although Murra has the right not to testify, not doing so weakens the credibility of her defense. The Government argues that it is "equally plausible (in fact, more plausible)" that the prosecutor made the remark "solely to explain that the jury ***could*** consider the credibility of the witnesses whom Murra called to testify."

Not all constitutionally impermissible remarks on a defendant's election not to testify are created equal. Some are egregious, *see United States v. Griffith*, 118 F.3d 318, 324 (5th Cir. 1997) (prosecutor, annoyed by defendant's audible "running commentary" during rebuttal argument, broke off mid-sentence, turned to the defendant, and asked, "Would you like to take the stand and testify?"), while some are more benign, *see United States v. Johnston*, 127 F.3d 380 (5th Cir. 1997). In *Johnston*, the prosecutor remarked during closing argument that

18

the jury instruction on prior inconsistent statements "reminds you that a defendant has the right not to testify. That is a constitutional right. It is yours. It is mine. It is theirs. Please value it. I do. Don't take into consideration the fact that whether or not anyone testified in this case is inappropriate." *Id.* at 398. We found that remark to be impermissible because it was a direct comment on the defendants' failure to testify. Although the government argued that there was an equally plausible explanation for the remark—the prosecutor was cautioning the jury ***not*** to consider whether the defendants testified, but to look instead only at the evidence and testimony presented to them—the comment "focused the jury's attention on the fact that the defendants did not testify," which constituted error. *Id.*

The comment here and the Government's argument in favor of equal plausibility resemble their counterparts in *Johnston*, so the result here should resemble *Johnston*'s result, as well. In both instances, the prosecutor "reminded" the jury that the defendant has a right not to testify. And in both instances, the government claimed that its intent in making the remark was innocuous. But just as the *Johnston* court did, we conclude that the Government's explanation is not equally plausible. If the Government here were, as it argues, focused on attacking the credibility of Murra's witnesses, there was no need for the prosecutor to preface that line of attack by calling to the jury's attention the fact that Murra did not testify. "[W]hatever the prosecutor's subjective intent in making the remark[], 'the character of the remark [was] such that the jury would naturally and necessarily construe it as . . . comment on the defendant's silence.'" *Gongora v. Thaler*, 710 F.3d 267, 277–78 (5th Cir. 2013) (quoting *Jackson v. Johnson*, 194 F.3d 641, 652 (5th Cir. 1999)) (alterations removed). Murra's election not to testify has nothing to do with the credibility of the witnesses she chose to present. The Government's comparison between the two—direct or not, purposeful or not—was inappropriate.

No. 17-10117

The Government attempts to distinguish *Johnston* by arguing that the prosecutor there made a "string of comments concerning the defendant's silence," while the prosecutor here made only a "brief comment." This distinction is more appropriately raised in the second step of the analysis, in which we determine whether the comment had a prejudicial effect. At this first step, we concern ourselves with neither the magnitude nor the frequency of the comments; rather, we review each comment to determine whether, on its face, it impinges on the Fifth Amendment rights of the defendant. This comment did.

Neither the fact that the prosecutor drew no negative inference from the defendant's election not to testify, nor the fact that Murra's counsel had the wherewithal to object at the first sign of violation—instead of letting the prosecutor continue on as counsel in *Johnston* did—cures the comment of its unconstitutional blight. That the prosecutor drew attention to Murra's decision alone is impermissible; the remark was a direct comment on Murra's decision not to testify, which the Fifth Amendment forbids.

**B**

Because the remark was impermissible, we must decide whether the remark "cast[s] serious doubt on the correctness of the jury's verdict." *United States v. Weast*, 811 F.3d 743, 752 (5th Cir. 2016) (quoting *United States v. Davis*, 609 F.3d 663, 677 (5th Cir. 2010)). This second step of the analysis "sets a high bar." *United States v. Rashad*, 687 F.3d 637, 643 (5th Cir. 2012) (quoting *United States v. Gracia*, 522 F.3d 597, 603 (5th Cir. 2008)). We look to three factors: "(1) the magnitude of the prejudicial effect of the prosecutor's remarks, (2) the efficacy of any cautionary instruction by the judge, and (3) the strength of the evidence supporting the conviction." *Davis*, 609 F.3d at 678 (citations and internal quotation marks omitted).

**1**

"The magnitude of the prejudicial effect is tested by looking at the prosecutor's remarks in the context of the trial in which they were made and attempting to elucidate their intended effect." *United States v. Fields*, 72 F.3d 1200, 1207 (5th Cir. 1996). Here, the prosecutor made no other similar comments, either before or after the challenged comment. *See United States v. Munoz*, 150 F.3d 401, 415 (5th Cir. 1998) (finding that a prosecutor's comment was not significantly prejudicial when viewed in light of the record as a whole because he only made one such comment). Moreover, the prosecutor did not stress to the jury an inference of guilt from Murra's silence as a basis for conviction. *See Anderson v. Nelson*, 390 U.S. 523, 524 (1968).

Murra attempts to inflate the prejudicial character of the comment by arguing that because the Government's "entire case" against her rested on credibility determinations and that by making the comment when he did, the prosecutor torpedoed her entire case. The comment is properly viewed more as "an isolated remark than a call for the jury to focus on the fact that the defendant[] did not testify." *McMillan*, 600 F.3d at 452–53; *see also Griffith*, 118 F.3d at 325 (finding that the magnitude of an improper remark was minimal because the remark "was an isolated comment, which did not 'strike at the jugular' of the defense"). Thus, we find that Murra has not shown that the remark was of a significantly prejudicial magnitude.

**2**

When a district court gives an immediate curative instruction, it "cures any alleged harm from [a] prosecutor's improper remarks." *McMillan*, 600 F.3d at 453. In *McMillan*, during rebuttal argument, the prosecutor stated that "Not one of these defendants is stepping up and saying that they [sic] did anything wrong." *Id.* at 452. The district court instructed the jury to disregard the prosecutor's comment and gave the curative instruction that "no defendant need

testify, they need put on no evidence, they need not put on anything at all." *Id.* When the prosecutor continued, he explained that he misspoke and meant to say that defense ***counsel*** blamed others without explaining or taking responsibility for the schemes in the case. *Id.* Assuming the prosecutor's comments were impermissible, we ruled that because the district court gave an immediate curative instruction, and because we had "previously held that such an instruction cures any alleged harm from the prosecutor's improper remarks," the comments did not rise above the level of harmless error. *Id.* at 453.

Here, the district court instructed the jury prior to closing arguments that "no inference whatsoever may be drawn from the election of the defendant not to testify," and that Murra, as the defendant, had no burden or duty of calling witnesses or producing evidence, Later, immediately following resolution of defense counsel's objection to the prosecutor's comment, the court instructed the jury to "disregard the last statement of the prosecutor and I will refer the jury to page 2 of the jury charge," which contained the instruction that the jury may not draw a negative inference from the defendant's decision not to testify. *McMillan* instructs that we deem the district court's charge and immediate, post-comment curative instruction sufficiently efficacious. *See also United States v. Turner*, 674 F.3d 420, 440 (5th Cir. 2012) ("We presume that such instructions are followed unless there is an overwhelming probability that the jury will be unable to follow the instruction and there is a strong probability that the effect [of the improper statement] is devastating.").

Murra is incorrect that a curative instruction must be "thorough" or "unequivocal." *See Weast*, 811 F.3d at 753. As we have explained, "[T]he district court can purge the taint of a prosecutor's prejudicial comments with a cautionary instruction, even, in some cases, one that is merely generic." *United States v. Reagan*, 725 F.3d 471, 492 (5th Cir. 2013) (citation and internal quotation marks omitted). Indeed, we have found generic cautionary instructions to be

adequately curative in several cases. *See id.* ("[Y]ou're bound to the evidence that you have heard, and you will recall what it was."); *Turner*, 674 F.3d at 440 ("The instruction did not specifically mention any statement that was made but reminded the jury that its verdict must be based on the evidence and not on prejudice or passion."); *Gracia*, 522 F.3d at 604 (instructions that the jury's duty was "to base [their] verdict solely upon the evidence without sympathy or prejudice," that the jury "must consider only the evidence presented during the trial," and that the jury should "[r]emember that any statements, objections or arguments made by the lawyers are not evidence" and remember that "[w]hat the lawyers say is not binding"); *see also United States v. McCann*, 613 F.3d 486, 497–98 (5th Cir. 2010) (affirming efficacy of "generic" instruction to the jury that "It is also your duty to base your verdict solely upon the evidence without prejudice and without sympathy,"[6] even though the district court gave no curative instruction immediately after prosecutor's improper comment).

The district court gave a clear instruction before the comment and a clear curative instruction immediately after the comment. *Cf. Johnston*, 127 F.3d at 399 (finding that district court's curative instruction did not mitigate prejudice when it was given more than a day after the impermissible comment and when the district court gave no instructions prior to closing arguments); *Griffith*, 118 F.3d at 324–25 (finding that the district court erred by giving no instruction to the jury after the challenged comment). We find that the instructions were effective.

**3**

The importance of the third factor in this analysis—the strength of the evidence supporting conviction—is lessened where the prejudice caused by the remark is minimal and the district court's curative instruction is effective in

---

[6] The decision in *McCann* does not actually quote this "generic" instruction the trial court gave. It can be found at Brief for Appellee at 38, *United States v. McCann*, 613 F.3d 486 (No. 09-30550), 2010 WL 4716238, at *38.

mitigating whatever prejudice may have been caused. Here, Ingrid and Vania, the victims whose suffering gave rise to the charges, testified at length about the abuse Murra exacted upon them. The Government presented a tape recording of Murra's voice in which she told the Guerreros they were destined for hell and acknowledged that she had forced Yuriria to sleep in the garage. The Government also proffered bank records which showed that Murra used the house cleaning revenues for her own personal gain and that she made no transfers to Ingrid during that time period. And, perhaps most importantly, the Government proffered several disinterested witnesses—former house cleaning clients of Murra's—who testified to observing the effects of Murra's abuse on Ingrid and Vania. Murra, by contrast, proffered as witnesses her own children, their spouses, occasional houseguests, and a half-sister who depended on Murra for shelter at the time of trial.

We find that the strength of the Government's evidence supporting Murra's conviction on all four counts completely outweighs any remaining perceived prejudicial effect of the prosecutor's comment. We therefore conclude that any error arising from the prosecutor's comment was harmless.

## VI

Finally, we address Murra's challenge to the district court's application of the "vulnerable victim" sentencing enhancement.

We review the district court's interpretation of the Sentencing Guidelines *de novo*, review a finding of unusual vulnerability for clear error, and determine whether the district court's conclusion was plausible in light of the record as a whole. *United States v. Jenkins*, 712 F.3d 209, 212 (5th Cir. 2013); *United States v. Robinson*, 119 F.3d 1205, 1218 (5th Cir. 1997). "[C]ommentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline." *Jenkins*, 712 F.3d at 212 (quoting *Stinson*

*v. United States*, 508 U.S. 36, 38 (1993)).

The vulnerable victim enhancement provision of the Guidelines states, "If the defendant knew or should have known that a victim of the offense was a vulnerable victim, increase by 2 levels." U.S.S.G. § 3A1.1(b)(1). The provision's commentary defines a "vulnerable victim" as a person "who is a victim of the offense of conviction" and "who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct." U.S.S.G. § 3A1.1 cmt. 2. The commentary cautions that the enhancement should not be applied "if the factor that makes the person a vulnerable victim is incorporated in the offense guideline." *Id.*

We have not previously addressed, in any precedential way, the application of this enhancement in this context.[7] But the great weight of authority from several of our sister circuits supports a conclusion that the enhancement was properly applied here. The Ninth Circuit upheld application of the enhancement to a sentence for involuntary servitude, where the district court found the victim was unusually vulnerable based on her immigrant status and the "linguistic, educational, and cultural barriers that contributed to her remaining in involuntary servitude." *United States v. Veerapol*, 312 F.3d 1128, 1132–33 (9th Cir.

---

[7] Murra's argument—that our decision in *United States v. Angeles-Mendoza*, 407 F.3d 742 (5th Cir. 2005), controls and compels the conclusion that the vulnerable victim enhancement was improperly applied—misses the mark. She points to the statement in *Angeles-Mendoza* that "[a]lthough the court may have been correct in noting the ***inherent*** vulnerability of smuggled aliens, we assume that such a characteristic was adequately taken into account in establishing the base offense level in U.S.S.G. § 2L1.1," *id.* at 748, and contends that the Government has not established how the victims' immigration status "made them any more unusually vulnerable than any other victim of harboring or forced labor." But the defendants in *Angeles-Mendoza* were not convicted of forced labor; they were convicted of conspiracy to smuggle, transport, and harbor illegal aliens. And because the alien status of the victims was contemplated by the base offense level for that crime, U.S.S.G. § 2L1.1, application of the vulnerable victim enhancement to those defendants' sentences was inappropriate. Here, however, the base offense level for Murra's convictions is set by U.S.S.G. § 2H4.1, which governs sentences for convictions involving peonage, involuntary servitude, slave trade, and child soldiers—like Murra's convictions for forced labor. *Angeles-Mendoza* does not govern here.

2002). The Seventh Circuit relied on *Veerapol* in affirming application of the enhancement to a sentence for forced labor where the victim was also an illegal alien. *See United States v. Calimlim*, 538 F.3d 706, 717 (7th Cir. 2008) ("[The victim] was a member of a group typically targeted by those desiring forced labor but her group (illegal aliens) is only part of the broader set of possible victims. She was therefore a vulnerable victim for the purposes of [the Guide-line]."). And the Second Circuit came to a similar conclusion, holding that the enhancement was properly applied in a forced labor case where the victims were aliens who had to accept the abusive conditions of the defendant's house-hold because they had no place else to live, no money, and no identification documents, and thus were completely dependent on the defendant for food, clothing, and shelter. *United States v. Sabhnani*, 599 F.3d 215, 254 (2d Cir. 2010); *accord United States v. Chang*, 237 F. App'x 985, 988–89 (5th Cir. 2007) (per curiam) (affirming application of the enhancement where a victim was ille-gally smuggled into the United States and forced to work until the contract repaying her smuggling debt was paid, and reasoning that the victim's illegal status made her a vulnerable victim).

Murra's base offense was two convictions for forced labor. Ingrid and Vania are illegal aliens—a group targeted as victims of forced labor. They were forced to accept the abusive conditions Murra created for them because they were in an unfamiliar country with no food, clothing, shelter, or money other than what Murra provided. And during the time Murra exercised complete dominion over them, she retained their immigration documents and threatened them with immigration-related retribution if they disobeyed her. On these bases, we con-clude that the district court's findings that Ingrid and Vania were vulnerable victims are plausible in light of the record and therefore are not clearly errone-ous. The district court correctly applied the enhancement in sentencing Murra.

**AFFIRMED.**